UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DANIEL YOUNG, *et al.*,

                Plaintiffs,

    v.

PATRICK E. PEÑA, *et al.*,

                Defendants.

Case No. C18-1007-JLR-MLP

REPORT AND RECOMMENDATION

## I.    INTRODUCTION AND SUMMARY CONCLUSION

This case involves numerous federal and state claims arising from interactions between Bellingham Police Officers Patrick Peña, Nicolas Sturlaugson, Travis Hauri, and Sgt. David Johnson (together with the City of Bellingham, "Defendants") with Katherine Wren Katzenjammer and Richard Young ("Plaintiffs") on the evening of June 2, 2016.[1] Plaintiffs' primary claims allege that Defendants' use of tasers constituted excessive force, and that Defendants' conduct in photographing Ms. Katzenjammer at a hospital violated her right to bodily privacy under the Fourth Amendment. This matter comes before the Court on Defendants'

---

[1] At the time of the events at issue, Ms. Katzenjammer was known as Daniel Young. As a result, Defendants refer to Plaintiff Katzenjammer as "Daniel" or "Daniel Young" in their briefing and declarations. The Court will refer to Ms. Katzenjammer by her chosen name unless it is necessary to accurately quote statements made by Defendants or other witnesses.

motion for summary judgment (dkt. # 11), that Plaintiffs oppose (dkt. # 34). For the reasons set forth below, the Court recommends that Defendants' motion for summary judgment (dkt. # 11) be GRANTED IN PART and DENIED IN PART.

## II.    BACKGROUND

On June 2, 2016, Plaintiff Richard Young, a 65-year-old First Nations man, was renting a two-bedroom apartment in Bellingham, Washington. (Dkt. # 35 at ¶¶ 2-3, 9.) It is undisputed that Mr. Young had three roommates at the time, although only one of his roommates was identified on the lease. (*Id*. at ¶¶ 10-19.) According to Mr. Young, each of his roommates went by numerous false names. (*Id*. at ¶¶ 12, 15-16, 17.) Mr. Young's longtime acquaintance Heather (who was identified by a false name on the lease), Heather's daughter Ashley (who was going by the name "Isabella Petrova"), and Ashley's brother (or boyfriend) Andrew Albers were all living in the apartment with Mr. Young.[2] (*Id*.) Mr. Young's daughter, Ms. Katzenjammer, came over to Mr. Young's apartment to visit and drink alcohol with her father on June 2nd, but she did not live there. (*Id*. at ¶¶ 25, 30.)

Defendants Patrick Peña and Nicolas Sturlaugson, who are both City of Bellingham Police Officers, were on patrol in the same vehicle when they responded to a 911 call around 9:15 p.m. that evening. (Dkt. # 12 (Sturlaugson Decl.) at ¶ 3; Dkt. # 13 (Peña Decl.) at ¶ 3.) A woman who identified herself to the 911 dispatcher and police officers as Isabella Petrova reported that a "Daniel" was drunk and starting fights at her apartment. (Dkt. # 12, Ex. A) (CAD

---

[2] The current whereabouts of any of these former roommates is unknown to Plaintiffs. (Dkt. # 1 at 9.) Plaintiffs assert that the roommates were all using fake names and misidentified themselves to police. Plaintiffs also make much of the fact that Isabella Petrova is the name of a fictional character in the popular Twilight book and movie series, presumably to suggest that Defendants should have recognized that she was identifying herself using a fake name. However, the Court is not persuaded that the name Isabella Petrova was so obviously false that the Officers should have distrusted her.

report from the 911 dispatch center). She further reported that Daniel was groping her and her friends, had broken a glass, and was laying on the ground screaming. (*Id*.) She said that she would wait outside for the officers. *Id.*

When Defendants arrived at the apartment complex, they contacted Ms. Petrova in the parking lot. (Dkt. # 12 (Sturlaugson Decl.) at ¶ 4.) She once again reported that Daniel/Ms. Katzenjammer was inside the apartment with Richard Young. (*Id*. at ¶ 5.) Ms. Petrova identified Richard Young to the officers as her uncle, although they are not actually related. (*Id*.) She again reported that Daniel was intoxicated and had groped her breast and thigh, and a friend standing with Ms. Petrova also reported that Daniel had groped her. (*Id*.) Ms. Petrova reported that she lives at the apartment with her brother and Richard Young, and asked the officers to remove Ms. Katzenjammer from the apartment. (*Id*.; *see also* Dkt. # 13 (Peña Decl.) at ¶ 4.)[3]

What took place next is captured on Officer Sturlaugson's body worn camera. (Dkt. # 42, Ex. A (Video 1)). Officer Peña's body worn camera was apparently malfunctioning and did not record anything during this incident. (Dkt. # 13 (Peña Decl.) at ¶ 4.)[4] Ms. Petrova walked Officers Peña and Sturlaugson to the apartment front door and let them in. (Dkt. # 42, Ex. A.) Upon entering the apartment, Richard Young was sitting upright on a couch in the living room across from the front door. (*Id*.) Ms. Katzenjammer was kneeling on the living room floor to the right of the officers. (*Id*.) Plaintiffs' assertion that they were sleeping when the officers entered,

---

[3] Officer Sturlaugson's case report reflects that during his initial conversation with Ms. Petrova upon his arrival at the apartment building, she appeared visibly shaken up and reported that "Daniel Young . . . had groped her thigh, and her breast. The friend she was with at the time also said she was groped at one point during the night by Daniel Young." (Dkt. # 12, Ex. B). He noted Ms. Petrova was hesitant to assist the officers "as a victim but ultimately wanted Daniel Young . . . removed from her apartment." (*Id*.)

[4] There are four additional videos provided by the body worn camera of Sgt. David Johnson. (Dkt. # 12, Ex. C.) The first video captures his arrival on the scene and subsequent events. The second shows officers transporting Ms. Katzenjammer to Officer Hauri's patrol vehicle. The third shows his conversation with Mr. Young. The fourth video shows the period of time when the officers removed the taser probes from Mr. Young. (Dkt. # 18 (Johnson Decl.) at ¶ 15.)

1    and therefore the officers startled them awake and immediately began issuing contradictory

2    orders, is not borne out by the video. (*Id.*)

3        The video shows that upon entering the apartment, Officer Peña immediately stated,

4    "Hey guys" and "[a]re you Daniel?" as he looked at Ms. Katzenjammer. (*Id.*) He began talking

5    to Ms. Katzenjammer about the reason the officers were there. (*Id.*) Officer Peña explained that

6    "if you are Daniel, we are just here to ask you to leave." (*Id.*) He told Ms. Katzenjammer that

7    other occupants, "other people that live here," had reported that "apparently you've been causing

8    a ruckus, you are too drunk they want you out." (*Id.*) He asked her to come outside to talk. (*Id.*)

9    At this point, both Mr. Young and Ms. Katzenjammer began questioning the officers as to who

10   wanted Ms. Katzenjammer to leave the apartment, and Ms. Petrova responded, "Right here."

11   (*Id.*) Officer Peña then asked if Ms. Katzenjammer wanted to speak outside, at which point Mr.

12   Young stood up and walked quickly towards Officer Peña saying "Sure, I want to talk to this

13   human being." (*Id.*) When the officers informed Mr. Young that they did not need to talk to him

14   and he could go sit down, Mr. Young said, "you don't?" and then raised his arms and reached

15   towards Officer Peña's chest or collar. (*Id.*) Although the body worn camera angle does not show

16   exactly what kind of contact was made between Mr. Young and Officer Peña, it does depict Mr.

17   Young raising his arms and reaching towards Officer Peña in a quick and aggressive manner as

18   though he was grabbing his collar area or chest. (*Id.*) The video also shows Mr. Young's arms

19   being quickly flung back again, presumably in response to a defensive movement by Officer

20   Peña. (*Id.*)

21       Mr. Young was not behaving, as he claims in his declaration, as someone trying to de-

22   escalate a heated situation and calmly question the officers. (Dkt. # 35 (Young Decl.) at ¶¶ 68-

23   70.)  Rather, the video shows that he was behaving as the aggressor. (Dkt.# 42, Ex. A.) Mr.

Young appeared intoxicated and hostile, with a furrowed brow. (*Id.*) Although Mr. Young has a health condition requiring dialysis three times per week (dkt. # 35 (Young Decl.) at ¶ 85), he displayed no difficulty rising from his chair and walking quickly towards Officer Peña. (Dkt. # 42, Ex. A.) As depicted in the video, Mr. Young is also a much taller man than Officer Peña. (*Id.*)

As Officer Peña pushed Mr. Young away, forcing Mr. Young back a few feet, he issued verbal warnings to stop or he could be tased. (*Id.*) After a short pause, Mr. Young shifted his body and took several steps towards Officer Peña a second time. (*Id.*) After a few steps, Officer Sturlaugson deployed his taser in dart mode. (*Id.*) The taser prongs impacted Mr. Young in his thigh, causing him to swear and fall backwards abruptly to the ground. (*Id.*) Taser records reflect that the taser was cycled one time for five seconds. (Dkt. # 15 (Starkovich Decl.) at ¶ 7, Ex. A (taser report for June 2).) After he was tased, Mr. Young remained on the ground but continued to argue with the Defendants. (Dkt. # 42, Ex. A.) Throughout Mr. Young's confrontation with Officer Peña, Ms. Katzenjammer remained kneeling on the floor. (*Id.*) When Mr. Young fell to the ground, he landed in close proximity to her. (*Id.*)

The parties have different versions of what happened next between Ms. Katzenjammer and the Defendants, and the video does not wholly resolve the factual dispute because only Ms. Katzenjammer's torso and above are visible. (*Id.*) Officers Peña and Sturlaugson assert that Mr. Young was lying on the ground with the taser wires from Officer Sturlaugson's taser still extending from the probes attached to his leg. (Dkt. # 12 (Sturlaugson Decl.) at ¶ 9; Dkt. # 13 (Peña Decl.) at ¶ 8.) After Ms. Katzenjammer tried to tell Defendants about her father's medical condition, Officer Sturlaugson told Ms. Katzenjammer, "we aren't trying to hurt him, but he can't hurt us." (Dkt. # 42, Ex. A.) Officer Peña had drawn his taser and told Ms. Katzenjammer

to "sit down, get away." (*Id.*) Defendants claim that after the taser cycle was complete, Ms. Katzenjammer began attempting to break the wires connecting Officer Sturlaugson's taser to the probes in Mr. Young's thigh. (Dkt. # 12 (Sturlaugson Decl.) at ¶ 9; Dkt. # 13 (Peña Decl.) at ¶ 8.) Officer Sturlaugson asserts that he was concerned that if the taser wires were broken, he would lose the ability to control Mr. Young because he could not cycle the taser again if Mr. Young became violent. (Dkt. # 12 (Sturlaugson Decl.) at ¶ 8.) In addition, Officer Peña asserts that his path to Ms. Katzenjammer was obstructed by Mr. Young's body, the taser wires from Officer Sturlaugson's taser, and a coffee table. (Dkt. # 13 (Peña Decl.) at ¶ 8.)

Ms. Katzenjammer asserts that she did not touch the taser wires attached to Mr. Young, but simply remained kneeling on the floor. (Dkt. # 36 (Katzenjammer Decl.) at ¶ 107.) Officer Peña does not explicitly mention the taser wires in his instructions to Ms. Katzenjammer, but continues to warn her that if she does not sit back on the couch she will get tased. (Dkt. # 42, Ex. A.) Ms. Katzenjammer appears intoxicated, defiant, and is non-compliant with Officer Peña's directive to sit back on the couch. (*Id.*) However, the video does not show Ms. Katzenjammer's hands, or whether she was attempting to remove the taser wires from her father's thigh or simply failing to comply with Officer Peña's order. (*Id.*) Ms. Katzenjammer asserts that she was furious and terrified, and posed no threat of harm to the officers as she remained on her knees. (Dkt. # 36 (Katzenjammer Decl.) at ¶¶ 100-01.)

After Ms. Katzenjammer failed to comply with Officer Peña's repeated orders, Officer Peña warned, "you're going to get tased, you're going to get tased." (Dkt. # 42, Ex. A.) Ms. Katzenjammer responded, "You can tase the fuck out of me and I will make weird things happen for your life." (*Id.*; Dkt. # 13 (Peña Decl.) at ¶ 9.) Officer Peña responded, "you need to get back

1    and sit on the couch." (*Id.*) Ms. Katzenjammer responded, "no." (*Id.*) Officer Peña then deployed

2    his taser in dart mode at Ms. Katzenjammer. (Dkt. # 13 (Peña Decl.) at ¶ 11.)

3         According to the video, the taser did not appear to have a neuro-muscular incapacitating

4    effect at first. (Dkt. # 42, Ex. A.) Ms. Katzenjammer promptly began wrapping the taser wires

5    around her hand. (*Id.*) Officer Peña then deployed his taser a second time, which appeared to

6    incapacitate Ms. Katzenjammer momentarily. (Dkt. # 13 (Peña Decl.) at ¶ 11.) Taser data

7    showed that Peña's first taser cycle lasted five seconds, and the second taser deployment

8    occurred immediately thereafter for the standard five seconds. (Dkt. # 15 (Starkovich Decl.) at ¶

9    8, Ex. A.) The two officers then began to restrain Mr. Young and Ms. Katzenjammer. (Dkt. # 42,

10   Ex. A.)

11        Before Plaintiffs were restrained in handcuffs, Officer Travis Hauri arrived on the scene.

12   (Dkt. # 17 (Hauri Decl.) at ¶ 5.) He began to subdue Ms. Katzenjammer, who was struggling and

13   resisting being put in handcuffs. (*Id.*) Officer Sturlaugson and Officer Peña were then able to

14   handcuff Mr. Young, and additional officers arrived on the scene.[5] (Dkt. # 42, Ex. A.) To

15   restrain Ms. Katzenjammer, Officer Hauri used his department issued wood baton and placed

16   one end of the baton on the floor and the other end across her shoulder. (Dkt. # 17 (Hauri Decl.)

17   at ¶ 7.) He applied more pressure if Ms. Katzenjammer's resistance intensified, but if she

18   lessened her resistance, he reduced the pressure. (*Id.*) The video does not clearly depict Officer

19   Hauri's use of the wooden baton, but it does reflect that Ms. Katzenjammer became more out of

20   control during Officer Hauri's contact with her. (Dkt. # 42, Ex. A.) She started screaming louder

21   and more frequently, and declined to calm down, stand up, or walk out of the apartment. (*Id.*)

22

23   _____

[5] The entire incident unfolded fairly quickly. Approximately one minute elapsed from the officers'
entrance to the apartment and Mr. Young's physical contact with Officer Peña. Only about four minutes
elapsed between the first taser application until both Plaintiffs were in handcuffs. (Dkt. # 42, Ex. A.)

1    After Officer Sturlaugson walked Mr. Young out of the apartment to the patrol vehicle,

2  Officer Peña asked Mr. Young to confirm the identity of his son (now daughter) "Daniel."

3  During that conversation, Officer Peña explained that Mr. Young would have been able to stay in

4  his apartment but "you rose up at me." (*Id.*) Mr. Young responded, "because you were being a

5  dick about it." (*Id.*) Officer Sturlaugson then said, "you shoved him, you can't assault an

6  officer." (*Id.*) Mr. Young was arrested for felony assault in the third degree for assaulting Officer

7  Peña. (Dkt. # 12 (Sturlaugson Decl.) at ¶ 16.)

8    Medics were called to check on the Plaintiffs. (Dkt. # 18 (Johnson Decl.) at ¶¶ 6, 8.)

9  After the medics advised the officers that Mr. Young did not need to go to the hospital, but

10  declined to remove the taser probes, Defendants directed Mr. Young to step out of the police car

11  "so that we could remove the taser probes." (Dkt. # 18 (Johnson Decl.) at ¶ 9.) Officer Hauri,

12  who had assisted in handcuffing and removing Ms. Katzenjammer from the apartment,

13  photographed the location of the taser probes on Mr. Young's body. (Dkt. # 17 (Hauri Decl.) at

14  ¶¶ 12.; Dkt. # 18 (Johnson Decl.) at ¶ 9 ("The officers on scene then had Richard Young step out

15  of the car so that we could remove the taser probes . . . The probes were photographed and

16  removed.").) The probes appeared to be attached to Mr. Young's clothing, rather than his body

17  or skin. (Dkt. # 12, Ex. C; Dkt. # 18 (Johnson Decl.) at ¶ 9.)

18    Ms. Katzenjammer remained uncooperative during the medics' attempt to evaluate her,

19  and can be heard on the video screaming constantly. (Dkt. # 12, Ex. C; Dkt. # 17 (Hauri Decl.) at

20  ¶¶ 6-9.) According to Defendants, the medics suspected that she may be suffering from a

21  condition called "excited delirium." (Dkt. # 12 at ¶¶ 15-16.) Video footage shows multiple

22  officers carrying Ms. Katzenjammer out of the apartment. (Dkt. # 12, Ex. C (Videos 2 and 3);

23  Dkt. # 17 (Hauri Decl.) at ¶ 9.) Even outside the apartment, Ms. Katzenjammer continued to yell,

1    disobey orders, and would not get in the patrol car. (Dkt. # 12, Ex. C.) Officer Hauri pinned her

2    against the car and used a wrist lock to gain compliance, which further increased Ms.

3    Katzenjammer's distress and yelling. (Dkt. # 17 (Hauri Decl.) at ¶ 9; Dkt. # 12, Ex. C.) Medics

4    administered medication to sedate Ms. Katzenjammer, and she fell asleep on the gurney and was

5    taken to St. Joseph's Hospital for treatment. (Dkt. # 12, Ex. C; Dkt. # 17 (Hauri Decl.) at ¶ 11.)

6    Ms. Katzenjammer was never placed under arrest, nor transported to the Whatcom County Jail

7    like Mr. Young. (Dkt. # 13 (Peña Decl.) at ¶ 19.)

8            Officer Hauri then went to the Emergency Department at St. Joseph Hospital with his

9    supervisor, Sgt. Johnson, to speak with Ms. Katzenjammer about the incident. (Dkt. # 18

10    (Johnson Decl.) at ¶ 11.) However, Officer Hauri and Sgt. Johnson found Ms. Katzenjammer

11    "unconscious and unable to answer any questions about the incident." (Dkt. # 18 (Johnson Decl.)

12    at ¶ 11; *see also* Dkt. # 17 (Hauri Decl.) at ¶ 13.) Sgt. Johnson states that, "as part of the

13    investigation, at the hospital Officer Hauri photographed the taser impact sites on Daniel

14    Young's body." (Dkt. # 18 (Johnson Decl.) at ¶ 11.)

15            According to Sgt. Johnson's Longarm Case Report,

16    Investigator Hauri and I went to the Emergency Department at St Joseph Hospital
      and located DANIEL YOUNG (C1) who was unconscious in one of the rooms.

17    A nurse advised that the taser probes had already been removed from DANIEL
      YOUNG (C1), but she had noted that three taser probes that contacted his abdomen

18    and one had contacted his thigh. Investigator Hauri photographed the possible
      locations where the probes had contacted DANIEL YOUNG (C1). DANIEL

19    YOUNG (C1) was unconscious during this entire process and we were unable to
      ask him any questions.

20    (Dkt. # 18, Ex. A at 3.)

21
22            Officer Hauri has a similar account of the hospital visit in his declaration:

23    I then went to the hospital to continue the investigation. I arrived at the hospital to
      find that Daniel Young was unconscious. He was thus unable to be interviewed
      about the criminal incident. As part of the investigation, I photographed the taser

impact sites on his body and a slight contusion on his right shoulder. I did not see any additional injuries. Daniel was left at the hospital and was not booked into jail.

(Dkt. # 17 (Hauri Decl.) at ¶ 13.)

Although neither party included the photographs (or even a detailed description of the photographs) in the record, it is undisputed that Officer Hauri photographed, at a minimum, Ms. Katzenjammer's abdomen, thigh, and right shoulder in a hospital room while she was the subject of an investigation but was not under arrest. (Dkt. # 18 (Johnson Decl.) at ¶ 11; Dkt. # 17 (Hauri Decl.) at ¶ 13; Dkt. # 1 at 13 (Ms. Katzenjammer alleges in her complaint that Officer Hauri uncovered her body and photographed the four puncture wounds from the two taser darts, a bruise inflicted by the officers, and her body in general).) It is also undisputed that because she was unconscious, Ms. Katzenjammer could not consent to these photographs being taken. (Dkt. # 17 (Hauri Decl.) at ¶ 13; Dkt. # 18 (Johnson Decl.) at ¶ 11.)

As noted above, Ms. Katzenjammer was left at the hospital, and not booked into jail. (Dkt. # 17 (Hauri Decl.) at ¶ 13.) She was later charged with several misdemeanors: assault in the fourth degree with sexual motivation, obstructing law enforcement, and resisting arrest. (Dkt. # 14 (Brady Decl.), Ex. B.) Mr. Young was booked into the Whatcom County Jail and charged with assault in the third degree for assaulting Officer Peña. (*Id.*, Ex. A; Dkt. # 18 (Johnson Decl.) at ¶ 9.) The criminal charges against both Plaintiffs were eventually dismissed under deferred prosecution agreements with the respective prosecutors' offices. (*Id.*, Ex. F.)

Plaintiffs brought this lawsuit seeking damages from the Defendants for numerous state and federal claims. (Dkt. # 1.) Plaintiffs allege that as a result of the incident with Defendants and the false charges brought against them, both Plaintiffs were evicted and became homeless for several months. (*Id.* at 14.)

REPORT AND RECOMMENDATION - 10

### III.    PROCEDURAL BACKGROUND

Plaintiffs' complaint alleges (1) Fourth Amendment violations for excessive force against Officers Peña, Sturlaugson, and Hauri; (2) Fourth Amendment violations related to Sgt. Johnson and Officer Hauri's photographing of Ms. Katzenjammer's body at the hospital; (3) substantive due process and equal protection violations pursuant to the Fourteenth Amendment due to discriminatory policing by Officers Peña, Sturlaugson, and Hauri; (4) violation of Plaintiffs' "zone of privacy"; (5) Fifth Amendment violations; (6) Eighth Amendment violations for cruel and unusual punishment; (7) First Amendment violations for retaliating against Plaintiffs; (8) supervisory liability for Sgt. Dave Johnson's conduct; and (9) municipal liability for the City of Bellingham. Plaintiffs also allege state law claims, such as false arrest and imprisonment, assault and battery, malicious prosecution, and intentional infliction of emotional distress. (Dkt. # 1 at 17-31.)

On December 3, 2018, Defendants filed their current motion for summary judgment. (Dkt. # 11.) Defendants seek dismissal with prejudice of all Plaintiffs' claims, and further argue that the individual Defendants are entitled to qualified immunity. (*Id*.)

By Order dated April 23, 2019, the Honorable James L. Robart denied Plaintiffs' motion to file an overlength response to Defendants' motion for summary judgment. (Dkt. # 39.) As Plaintiffs had already filed a 30-page response, Judge Robart held that "the court will disregard the text of Plaintiffs' summary judgment response that appears after page 25[.]" (*Id*. at 2.) (citing LCR 7(e)(6) ("The court may refuse to consider any text, including footnotes, which is not included within the page limits.")). Accordingly, the Court cannot consider Plaintiffs' responses to Defendants' motion for summary judgment with respect to several of Plaintiffs' claims included on pages 26 through 30 of the responsive brief. (Dkt. #34 at 26-31.) Specifically, Judge

Robart's Order limited Plaintiffs' arguments with respect to alleged violations of the First Amendment, malicious prosecution, race discrimination/equal protection, supervisory liability, *Monell* liability, assault and battery, false arrest and imprisonment, and outrage. (*Id.*)

## IV.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

However, the court need not, and will not, "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). Uncorroborated allegations and

1    "self-serving testimony" will not create a genuine issue of material fact. *Villiarimo v. Aloha*

2    *Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *T.W. Elec. Serv. v. Pac Elec. Contractors*

3    *Ass'n*, 809 F. 2d 626, 630 (9th Cir. 1987).

4         **B.    Body Worn Camera Footage**

5         As discussed above, the parties' version of the events that took place on the evening of

6    June 2, 2016 differ substantially. Typically, on summary judgment, courts are required to view

7    the facts and draw reasonable inferences "in the light most favorable to the party opposing the

8    [summary judgment] motion." *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962) (per

9    curiam). The United States Supreme Court has acknowledged that "[i]n qualified immunity

10   cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550

11   U.S. 373, 376 (2007). However, where the record contains "a videotape capturing the events in

12   question," and "the videotape tells quite a different story" from the non-moving party's version

13   of events, the Court is not obligated to adopt that version. In other words, "[w]hen opposing

14   parties tell two different stories, one of which is blatantly contradicted by the record, so that no

15   reasonable jury could believe it, a court should not adopt that version of the facts for purposes of

16   ruling on a motion for summary judgment." *Id*. at 380. Instead, the court should view the facts in

17   the light depicted by the videotape. *Id*. at 381.

18        As noted above, Officer Sturlaugson was wearing his department issued body worn

19   camera throughout his interactions with Plaintiffs. (Dkt. # 12 (Sturlaugson Decl.) at ¶ 19.) He

20   subsequently learned that his camera had been inadvertently turned sideways, and therefore the

21   video footage appears from a sideways perspective when viewing. (*Id*.) Defendants provided the

22   video of the recording, which Police Department forensics altered only by turning it upright for

23   easier viewing. (Dkt. # 12, Ex. C) (body worn camera footage from Officer Sturlaugson and

1    other officers on the scene); (Dkt. # 12 (Sturlaugson Decl.) at ¶ 19) ("I viewed the video after it

2    was turned right side up and it was otherwise unaltered and accurately represents what occurred

3    on the day in question."); (Dkt. # 16 (Yoder Decl.) at ¶ 4 ("Through video forensic software

4    Input Act, I was able to turn 3 of the videos from horizonal to vertical so that it is easier to view

5    the videos . . . The BWC video content was not altered in any way.").

6          Plaintiffs make much of the Defendants' alteration of Officer Sturlaugson's video, and

7    ask the Court to strike the video on this basis. (Dkt. # 34 at 13-14.) However, Plaintiffs' request

8    is denied. On April 29, 2019, Plaintiffs also provided a copy of the original video. (Dkt. # 42

9    (Second Sturlaugson Decl.), Ex. A.) The Court has reviewed both the altered and unaltered

10   videos numerous times, and finds no discrepancies between them apart from the vertical angle of

11   the "altered" footage. In any event, the Court has not relied on the vertical footage.

12         Similarly, Plaintiffs make much of the fact that Officer Peña's body worn camera was not

13   functioning properly during his interactions with the Plaintiffs. (Dkt. # 34 at 13-15.) However,

14   there is no evidence to suggest that this malfunction was due to any wrongdoing on the part of

15   Defendants. Plaintiffs' motion to strike the video footage should therefore be DENIED.

16         **C.    Plaintiffs' § 1983 Excessive Force Claim**

17         Defendants argue that Plaintiffs' § 1983 excessive force claim against Officers Peña,

18   Sturlaugson, and Hauri should be dismissed on summary judgment because there is no genuine

19   issue of material fact as to the reasonableness of Defendants' actions with respect to Mr. Young

20   and Ms. Katzenjammer. Moreover, Defendants contend that they are entitled to qualified

21   immunity. (Dkt. # 11 at 7.)

22              *1.    Legal Standards for Qualified Immunity and Excessive Force Claims*

23         The doctrine of qualified immunity protects government officials from civil liability

     under § 1983 if "their conduct does not violate clearly established statutory or constitutional

1   rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 4-5 (2013)

2   (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *see also Kisela v.*

3   *Hughes*, 138 S. Ct. 1148, 1152 (2018). "Qualified immunity gives government officials

4   breathing room to make reasonable but mistaken judgments about open legal questions" and

5   "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v.*

6   *al-Kidd*, 563 U.S. 731 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

7   "To determine whether an officer is entitled to qualified immunity, a court must evaluate

8   two independent prongs: (1) whether the officer's conduct violated a constitutional right, and (2)

9   whether that right was clearly established at the time of the incident." *Castro v. Cnty. of L.A.*,

10   797 F.3d 654, 663 (9th Cir. 2015) (citing *Pearson*, 555 U.S. at 232).

11   With respect to the first prong, Plaintiffs allege that Defendants violated their Fourth

12   Amendment right to be free from the unreasonable use of force. *See Graham v. Connor*, 490

13   U.S. 386 (1989) (Fourth Amendment prohibits unreasonable use of force by law enforcement

14   officers in the course of an arrest). "[O]fficers may only use such force as is 'objectively

15   reasonable' under the circumstances." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir.

16   2001) (quoting *Graham*, 490 U.S. at 397). To determine whether the force allegedly used was

17   objectively reasonable, the Court must balance "the nature and quality of the intrusion on the

18   individual's Fourth Amendment interests against the countervailing governmental interests at

19   stake." *Graham*, 490 U.S. at 396. In other words, the Court weighs the type and amount of force

20   inflicted against the severity of the crime at issue, whether the suspect poses an immediate threat

21   to the safety of officers or others, whether the suspect is actively resisting arrest or attempting to

22   evade arrest by flight, and any other relevant factors. *See id.*; *Bryan v. MacPherson*, 630 F.3d

23   805, 826 (9th Cir. 2010). Officers are not required to use "the least intrusive means available so

1    long as they act within a range of reasonable conduct." *Glenn v. Wash. Cnty.*, 673 F.3d 864, 878

2    (9th Cir. 2011).

3        On summary judgment, whether an officer used objectively reasonable force is a question

4    for the Court to decide after viewing the disputed issues of material fact and drawing all

5    reasonable inferences in Plaintiffs' favor. *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). The

6    reasonableness of a particular use of force must be judged from the perspective of a reasonable

7    officer on the scene, rather than with the 20/20 vision of hindsight. *See Graham*, 490 U.S. at 396.

8    Because the Court has body camera video capturing the events at issue, the Court will

9    incorporate review of the video in its reasonableness analysis.  *Scott*, 550 U.S. at 380.

10        With respect to the second prong of the qualified immunity analysis, the question before

11    the Court is whether the right to be free from the allegedly excessive force was clearly

12    established at the time of the incident. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In other words,

13    the Court must determine whether it would be clear to a reasonable officer that his conduct was

14    unlawful in the situation he confronted. *Id.* at 202; *see also Kisela*, 138 S. Ct. at 1153 ("An

15    officer cannot be said to have violated a clearly established right unless the right's contours were

16    sufficiently definite that any reasonable official in the defendant's shoes would have understood

17    that he was violating it."). "Because the focus is on whether the officer had fair notice that [his]

18    conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the

19    conduct."  *Kisela*, 138 S. Ct. at 1152 (quoted source omitted, alteration added). The Supreme

20    Court's "caselaw does not require a case directly on point," but "existing precedent must have

21    placed the statutory or constitutional question beyond debate." *Id.* (quoted source omitted). It is a

22    plaintiff's burden to establish that the law was clearly established at the time of the incident.

23

1  *Greene v. Camreta*, 588 F.3d 1011, 1031 (9th Cir. 2009), *vacated in part by Greene v. Camreta*,

2  661 F.3d 1201 (9th Cir. 2011).

3        Although the two prongs of the qualified immunity analysis are independent, the type and

4  amount of force allegedly used is relevant to determining whether the officer had fair notice that

5  his conduct was unreasonable. If the Court determines that, taking the facts in the light most

6  favorable to Plaintiffs, the Defendants' conduct amounts to a violation of a constitutional right,

7  the Court must then determine whether the Defendants are entitled to qualified immunity by

8  assessing whether "the right at issue was clearly established at the time of [the Defendants']

9  alleged misconduct." *Pearson*, 555 U.S. at 232 (2009) (internal quotation marks omitted).

10              *2.      Whether Defendants Violated Plaintiffs' Constitutional Rights*

11        The Court must decide whether, viewing the evidence in Plaintiffs' favor (unless

12  Plaintiffs' account is directly contradicted by the videotape), Defendants used an objectively

13  unreasonable degree of force against Plaintiffs. To answer this question, the Court must balance

14  the *Graham* factors identified above. The Court will consider each factor in turn before engaging

15  in the requisite balancing.

16              *a.      Nature and Quality of the Intrusion*

17        The Ninth Circuit has noted that when assessing reasonableness, it is important to keep in

18  mind the magnitude of the pain and injuries caused by the use of force. *Mattos v. Agarano*, 661

19  F.3d 433, 443 (9th Cir. 2011). Taser strikes in dart mode are generally considered intermediate

20  force. *See Bryan*, 630 F.3d at 824-26 (holding that tasers used in dart-mode "constitute an

21  intermediate, significant level of force."); *see also Mattos v. Agarano,* 661 F.3d 433, 440 (9th

22  Cir. 2011). The Ninth Circuit has acknowledged that "while less severe than deadly force,

23

1   [intermediate force] nonetheless present[s] a significant intrusion upon an individual's liberty

2   interests." *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1161 (9th Cir. 2011).

3          Plaintiffs imply that because of their preexisting medical conditions, the use of tasers to

4   subdue them could have amounted to deadly force. (Dkt. # 34 at 20.) Ms. Katzenjammer asserts

5   that it could have dislodged her pulmonary embolism, and Mr. Young asserts that "the tasing

6   could have killed me because of [my kidney] condition." (Dkt. # 35 (Young Decl.) at ¶ 87; Dkt.

7   # 36 (Katzenjammer Decl.) at ¶¶ 104-05.)

8          The Court finds that the use of tasers by the Defendants in this case amounted to

9   intermediate force rather than deadly force. *See Bryan*, 630 F.3d at 815. As discussed above, Mr.

10  Young was tased once for five seconds, and the taser had an immediate and incapacitating effect

11  on him. (Dkt. # 12 (Sturlaugson Decl.) at ¶ 8.) Ms. Katzenjammer was tased twice, as the first

12  taser application did not appear to have an any neuro-muscular effect. (Dkt. # 13 (Peña Decl.) at

13  ¶ 11.) Ms. Katzenjammer asserts in her declaration that "after being tased the first time, I

14  couldn't move from the shock and the pain." (Dkt. # 36 (Katzenjammer Decl.) at ¶ 102.)

15  However, this assertion is contradicted by the video of her immediately sweeping aside the taser

16  wires and attempting to wrap them around her hands while continuing to stare Officer Peña in

17  the eye. (Dkt. # 42, Ex. A.) It was only after the second taser deployment that Ms. Katzenjammer

18  fell forward and appeared to be momentarily incapacitated by the taser. (*Id*.)

19         Plaintiffs have not pointed to any direct evidence in the record, apart from their own

20  conclusory assertions, showing that the taser strikes presented a substantial risk of causing death

21  or serious bodily injury due to their unique medical conditions. Plaintiff have also not shown that

22  the officers were aware of Plaintiffs' unique medical conditions prior to discharging the tasers.

23  After Mr. Young was in custody, medics determined that he did not require any medical

attention. (Dkt. # 13 (Peña Decl.) at ¶ 14; Dkt. # 18 (Johnson Decl.) at ¶ 8.) In fact, when the officers attempted to remove the taser probes from Mr. Young's thigh following his arrest, the video reflects that the probes did not even break Mr. Young's skin. (Dkt. # 18 (Johnson Decl.) at ¶ 9.) There is also no evidence in the record that Ms. Katzenjammer required any medical attention as a result of the taser application. Rather, evidence from Defendants indicates that she was transported to the hospital for treatment because the medics believed she was suffering from excited delirium. (Dkt. # 18 (Johnson Decl.) at ¶ 6.)

Similarly, although the Defendants admit to using certain control grips (such as grabbing Plaintiffs' hair or holding them in a wrist lock) to subdue the Plaintiffs when they were resisting arrest, Plaintiffs do not claim to have sustained any lasting injuries from these methods or explain how the force used to subdue them was excessive. (Dkt. # 13 at 16 (Peña Longarm Case Report).) Control holds, pain techniques, pushing, and taking the suspect to the ground are generally considered minimal uses of force. *See Graham*, 490 U.S. at 396; *Tatum v. City and Cnty. of San Francisco*, 441 F.3d 1090 (9th Cir. 2006).

Thus, the taser strikes in this case constitute intermediate force. Even if the taser strikes were something more, they did not rise to the level of deadly force. *See City of Hemet*, 394 F.3d at 702 (declining to find that officers used deadly force but finding that the force was "even greater" than "intermediate" or "severe" force); *Mattos*, 661 F.3d at 443 (declining to define precise level of force but still proceeding to determine reasonableness of officer's actions).

### 3.    *Government's Interest in Using Force*

As noted above, the governmental interest is measured by considering the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officer or

1   others, whether the suspect was actively resisting arrest or attempting to evade arrest, and any

2   other relevant factors.

3                              *a.*      *Severity of the Crime*

4            Plaintiffs claim that this factor favors them because Mr. Young calmly asked to speak

5   with Officer Peña after the officers created a heated situation. Plaintiffs allege that Mr. Young

6   did not provoke the officers in any way, and he was simply putting out his hand to wave away

7   Officer Peña's next push when he was tased. (Dkt. # 34 at 9.) The video shows that, on the

8   contrary, Mr. Young got up from his chair in an angry and belligerent manner, walked to Officer

9   Peña, and either grabbed his collar or chest. (Dkt. # 42, Ex. A.) As noted above, Mr. Young is a

10  much larger man than Officer Peña. Officer Peña pushed Mr. Young away, forcing Mr. Young

11  back a few feet, while issuing verbal warnings to stop or he could be tased. (*Id.*) After a short

12  pause, Mr. Young shifted his body and started to move towards Officer Peña a second time. (*Id.*)

13  After a few steps, Officer Sturlaugson deployed his taser in dart mode. (*Id.*) Thus, the video

14  reflects that Mr. Young was tased following his physical assault on Officer Peña. The

15  seriousness of Mr. Young's crime, which involved physical violence against a police officer and

16  constitutes a felony, weighs in favor of Defendants.

17           With respect to Ms. Katzenjammer, the Court must assume that she was not, as

18  Defendants allege, attempting to remove the taser wires from her father's leg. Ms.

19  Katzenjammer's hands are not visible on the video, and none of the officers mention the taser

20  wires to her during the short interaction that proceeded her being tased. The officers do not, for

21  example, direct her to "stop touching the wires" or "stop touching Mr. Young." Instead, Officer

22  Peña just keeps telling her to sit on the couch.

23

In addition, the officers were responding to a 911 call based on Ms. Katzenjammer's

reported assault in the fourth degree with sexual motivation for "groping" two young women.

Before entering the apartment, the officers confirmed this report with the two young women on

the scene. After entering the apartment, Ms. Katzenjammer consistently refused to comply with

any of the officers' directives, from their first request that she step outside of the apartment to

their request that she move to the couch immediately after Mr. Young was tased. (Dkt. # 42, Ex.

A.) After she was tased, she thrashed about wildly, yelled constantly, and refused to submit to

handcuffing or get in the police car. (*Id.*) Thus, the crimes at issue, where Ms. Katzenjammer is

concerned, are fourth degree assault, obstruction of justice, and resisting arrest. As Ms.

Katzenjammer's crimes are all misdemeanors, this factor weighs less in favor of Defendants

where Ms. Katzenjammer is concerned.

> b.   *Whether the Suspect Posed an Immediate Threat to the Officers'*
> *or Public's Safety*

The "'most important' factor under *Graham* is whether the suspect posed an 'immediate

threat to the safety of officers or third parties.'" *George v. Morris*, 736 F.3d 829, 838 (9th Cir.

2013) (quoting *Bryan*, 630 F.3d at 826). The immediacy of the "threat analysis must be based on

objective factors and not merely 'a simple statement by an officer that he fears for his safety or

the safety of others.'" *Nelson v. City of Davis*, 685 F.3d 867, 880 (9th Cir. 2012) (quoting *Deorle

v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001)). Likewise, the officer's use of force must be

evaluated based on "his contemporaneous knowledge of the facts," and the Court cannot

consider evidence of which he was not aware. *Deorle*, 272 F.3d at 1281.

As discussed above, Mr. Young is captured on video initiating violent contact with

Officer Peña. (Dkt. # 42, Ex. A.) Even after he is pushed back and warned that he could be tased,

he begins to approach Officer Peña a second time. (*Id.*) Mr. Young was visibly intoxicated,

angry, and larger than Officer Peña. (*Id.*) A reasonable officer in Officer Sturlaugson's position could have found that he presented an immediate threat to Officer Peña's safety. (*Id.*)

Even assuming that Ms. Katzenjammer was not attempting to remove the taser probes from Mr. Young's thigh to enable Mr. Young to continue to pose a physical threat to the officers, a reasonable officer could have found her behavior threatening. After Ms. Katzenjammer failed to comply with Officer Peña's repeated orders, Officer Peña warned, "you're going to get tased, you're going to get tased." (Dkt. # 42, Ex. A.) Ms. Katzenjammer responded, "You can tase the fuck out of me and I will make weird things happen for your life." (*Id.*; Dkt. # 13 (Peña Decl.) at ¶ 9.) Officer Peña repeated, "you need to get back and sit on the couch." (*Id.*) Ms. Katzenjammer responded, "no." (*Id.*) Officer Peña then deployed his taser in dart mode at Ms. Katzenjammer. (Dkt. # 13 (Peña Decl.) at ¶ 11.)

Given the totality of the circumstances, including the fact that the officers were responding to a 911 call about an assault committed by Ms. Katzenjammer, the fact that Mr. Young had just physically assaulted Officer Peña, and Ms. Katzenjammer was kneeling defiantly and making threatening statements on the floor right next to the taser wires and Mr. Young's prone body, a reasonable officer could have found that Ms. Katzenjammer's refusal to comply with their orders presented a threat to the officers' safety. Thus, this factor weighs in favor of Defendants.

          *c.*    *Whether the Suspect was Resisting Arrest or Attempting to Escape*

The third *Graham* factor is whether the suspect was actively resisting arrest or attempting to evade arrest by flight. Defendants argue that this factor weighs in their favor because both Plaintiffs ignored their commands to submit to handcuffing and resisted the officers' handcuffing attempts. As discussed above, the video also shows that Mr. Young made an aggressive physical

1    contact with Officer Peña, and Ms. Katzenjammer attempted to defeat the first taser deployment

2    by defiantly twirling the taser wires around her hand. The videos show that both Plaintiffs were

3    actively resisting arrest. (Dkt. # 12, Ex. C; Dkt. # 42, Ex. A.) Once the officers attempted to

4    place Ms. Katzenjammer in handcuffs, she repeatedly refused to obey their orders and continued

5    to thrash and scream. (Dkt. # 12, Ex. C.) The Defendants were forced to use control holds and

6    similar measures (short of taser deployment) against Ms. Katzenjammer to overcome her

7    resistance posed to them. (*Id*.) Namely, the officers pinned her to the ground, handcuffed her,

8    and physically carried her from the apartment. (*Id*.) Because she would not get into the police

9    car, medics sedated her and transported her to the hospital. (*Id*.) Accordingly, this factor weighs

10    in favor of Defendants.

*4.     Balancing the* Graham *Factors*

12    Having assessed the type and amount of force inflicted, as well as the governmental

13    interests favoring the use of force, the Court must balance those factors to determine whether

14    Defendants' use of force was objectively reasonable under the totality of the circumstances. As

15    discussed above, the Court finds that the taser strikes administered to Plaintiffs by Defendants

16    amounted to an intermediate level of force. Viewing the evidence from the perspective of a

17    reasonable officer on the scene, this level of force was objectively reasonable under the

18    circumstances.

19    As discussed in detail above, both Plaintiffs repeatedly defied the officers' orders from

20    the moment they entered the apartment. Mr. Young defied orders to sit back down in his chair,

21    and instead assaulted Officer Peña. (Dkt. # 42, Ex. A.) Defendants' judgments with respect to

22    Mr. Young, by discharging the taser once for five seconds when Mr. Young appeared to be

23

1 making a second effort to assault Officer Peña, were reasonable. Mr. Young also resisted arrest

2 when Defendants attempted to put him in handcuffs.

3       Given the totality of the circumstances, the officers also used a reasonable level of force

4 by discharging the taser at Ms. Katzenjammer. As discussed in detail above, Defendants were

5 responding to a 911 call about an assault committed against two young women by Ms.

6 Katzenjammer, a report which the officers verified in the parking lot before entering the

7 apartment. Although Ms. Katzenjammer remained kneeling on the floor throughout the entire

8 interaction, she behaved defiantly and threatened Officer Peña by stating, "You can tase the fuck

9 out of me and I will make weird things happen for your life." (Dkt. # 42, Ex. A.) Contrary to the

10 officers' repeated instructions that she move away from Mr. Young's prone body to the couch,

11 she remained on the floor near the taser wires. (*Id.*) Defendants could reasonably believe that Ms.

12 Katzenjammer presented a risk of harm to the officers and that use of the taser was reasonable.[6]

13       Because the Court finds that the Defendants' use of force against both Mr. Young and

14 Ms. Katzenjammer was objectively reasonable under the circumstances and did not violate their

15 Fourth Amendment rights, the Court need not proceed to the next step of the qualified immunity

16 analysis and consider whether the right at issue was clearly established at the time. *See Pearson*,

17 555 U.S. at 232.

18       **D.    Ms. Katzenjammer's Fourth Amendment Claim Regarding Officer Hauri**
          **Photographing Her Body Without Her Consent at the Hospital**

19

20       As discussed above, it is undisputed that after Ms. Katzenjammer was sedated and

21 transported to St. Joseph's hospital for medical treatment, Officer Hauri and his supervisor, Sgt.

22 Johnson, drove to the hospital to photograph her body as an attempt to gather evidence and

23

[6] Similarly, given Ms. Katzenjammer's substantial resistance to arrest once the officers began to attempt to put her in handcuffs, the minimal force (such as control holds) the officers used to subdue and handcuff her was also reasonable.

1  document any injuries. (Dkt. # 18, Ex. A at 3; Dkt. # 17 (Hauri Decl.) at ¶ 13.) Ms.

2  Katzenjammer was unconscious, and therefore these photographs were taken without her

3  consent. (*Id*.) As Defendants' conceded during oral argument, at the time the photographs were

4  taken, Ms. Katzenjammer was the subject of the officers' investigation, but she was not under

5  arrest. After she was released from the hospital, she was cited for multiple misdemeanors. (Dkt.

6  # 14, Ex. D.)

7      Plaintiffs assert that the unlawful nature of Defendants' conduct in photographing Ms.

8  Katzenjammer's body is well established, citing the United States Supreme Court's decision in

9  *Bell v. Wolfish*, 441 U.S. 520 (1979) as well as cases pertaining to strip searches of pretrial

10  detainees in custodial facilities. (Dkt. # 34 at 23) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979);

11  *Allison v. GEO Group, Inc*., 611 F.Supp.2d 433 (2009)). Plaintiffs points out that not only was

12  Ms. Katzenjammer not in police custody at the time the photographs were taken, but she was

13  eventually charged with misdemeanors that would not justify such a search even if she had been

14  in custody. (*Id*. at 24.) Finally, during oral argument, Plaintiffs emphasized the highly intrusive

15  nature of photographing Ms. Katzenjammer's thigh and abdomen where the taser probes had

16  struck her, especially because Ms. Katzenjammer was undergoing gender reassignment.

17      Defendants only briefly acknowledge Plaintiffs' claim that Officer Hauri unlawfully

18  photographed Ms. Katzenjammer's unconscious body at the hospital in their reply brief. (Dkt. #

19  40.) Without addressing *Bell v. Wolfish*, Defendants assert that "the officers are entitled to

20  qualified immunity because the Plaintiffs have not cited any on point case law that clearly

21  establishes that this particular conduct (photographing the injuries of a subject at the hospital

22  who was involved in a use of force incident with the police) was unconstitutional." (*Id*. at 10.)

23  Defendants cite only one unpublished case from the District of Oregon in support of their

1    argument that the photographs were lawfully taken. (*Id.* (citing *Wagoner v. City of Portland*,

2    2017 WL 2369399 (D. Or. January 20, 2018)). However, the *Wagoner* decision is easily

3    distinguishable. In that case, the plaintiff was arrested for using a false name and resisting arrest

4    following a traffic stop, and subsequently photographed by officers while crying in the holding

5    cell at the jail. The officers took three photographs of the plaintiff's head and upper torso – one

6    head-on, and one from each side. *Id.* at *3. The court held that "photographing a person

7    *following their arrest* is sufficiently common that documenting her physical condition was not an

8    'extraordinary transgression of the bounds of socially tolerable conduct' under the specific

9    circumstances of this case." *Id*. at *11 (emphasis added). This case is not on point, as Officer

10   Hauri photographed Ms. Katzenjammer's body without her knowledge or consent while she was

11   unconscious in a hospital room, and not in a jail holding cell following an arrest.

12       A court may, within its discretion, decide which of the two prongs of the qualified

13   immunity analysis should be addressed first in light of the particular circumstances of the case.

14   *See Pearson*, 555 U.S. at 236. As there is limited caselaw on point in the Ninth Circuit, and the

15   particular facts of those cases inform the Court's analysis of Ms. Katzenjammer's claim, the

16   Court will begin by discussing the relevant cases.

17            1.    *Clearly Established Law in June 2016*

18       To be clearly established, "[t]he contours of the right must be sufficiently clear that a

19   reasonable official would understand that what [she] is doing violates that right." *Anderson v.

20   Creighton*, 483 U.S. 635, 640 (1987). *See also Dunn v. Castro*, 621 F.3d 1196, 1201 (9th Cir.

21   2010) ("[T]he right allegedly violated must be defined at the appropriate level of specificity

22   before a court can determine if it was clearly established.") (quoting *Wilson v. Layne*, 526 U.S.

23   603, 615 (1999)). This high standard is intended to give officers breathing room "to make

1    reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S.

2    731, 743 (2011). While the United States Supreme Court has repeatedly admonished this court

3    not to define clearly established law at a high level of generality, *see, e.g.*, *City & Cty. of S.F. v.*

4    *Sheehan*, ⸺ U.S. ⸺, 135 S.Ct. 1765, 1775–76 (2015), we need not identify a prior identical

5    action to conclude that the right is clearly established. *Anderson*, 483 U.S. at 640.

6         We first look to binding precedent to determine whether a law was clearly established.

7    *Chappell v. Mandeville*, 706 F.3d 1052, 1056 (9th Cir. 2013). In the absence of binding

8    precedent, the court may look to whatever decisional law is available in order to determine

9    whether or not the law was clearly established at the time the alleged acts occurred. *Capoeman v.*

10   *Reed,* 754 F.2d 1512, 1514 (9th Cir. 1985) (citations omitted).

11        The United States Supreme Court has long recognized that the integrity of an individual's

12   person is a cherished value of our society. *Schmerber v. California,* 384 U.S. 757, 772 (1966).

13   "The overriding function of the Fourth Amendment is to protect personal privacy and dignity

14   against unwarranted intrusion by the State." *Id.* at 767. To date, the Ninth Circuit never has

15   articulated a clear standard for when an officer's intentional viewing of an individual's naked

16   body is constitutionally permissible under the Fourth Amendment.[7] However, the "[t]he

17   touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250

18   (1991) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967)).

19        Reasonableness, an inherently flexible standard, generally requires balancing the degree

20   to which the search intrudes upon an individual's privacy against the degree to which the search

21   is needed to further legitimate governmental interests. *United States v. Knights*, 534 U.S. 112,

22

23   ───────────

[7] Other Circuits have recognized that when a search involves "movement of clothing to facilitate visual inspection of a [person's] naked body," the search qualifies as a type of "sexually invasive search." *Sims v. Labowitz*, 885 F.3d 254, 261 (4th Cir. 2018). To determine whether a sexually invasive search is reasonable, courts employ the test adopted in *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

1    118–19 (2001). The standard "is not capable of precise definition or mechanical application."

2    *Bell,* 441 U.S. at 559. In each case, the court must determine whether the challenged search is

3    reasonable under the particular facts and circumstances before the court. *Id.*; *Terry v. Ohio,* 392

4    U.S. 1, 21 (1968). Under the framework articulated by the United States Supreme Court in *Bell*

5    *v. Wolfish* in 1979, courts balance the invasion of personal rights caused by the search against the

6    need for that particular search by considering the following factors: "(1) the scope of the

7    particular intrusion, (2) the manner in which it is conducted, (3) the justification for initiating it,

8    and (4) the place in which it is conducted." *Byrd v. Maricopa Cty. Sheriff's Dep't*, 629 F.3d

9    1135, 1141 (9th Cir. 2011) (citing *Bell*, 441 U.S. at 559 (internal quotation marks omitted)).

10         Over a decade before the *Bell* decision, in *York v. Story*, the Ninth Circuit held that the

11   plaintiff had alleged sufficient facts to state a claim for invasion of bodily privacy when three

12   police officers took and distributed nude photos of her after she reported being assaulted. 324

13   F.2d 450, 452, 455-56 (9th Cir. 1963). Plaintiff was directed to undress in a room of the police

14   station despite her objections and insistence that she did not have bruises that required her to be

15   photographed in the nude. *Id*. at 452. The court held that the "naked body" is the most "basic

16   subject of privacy," and that plaintiff had sufficiently stated a claim that the officers violated her

17   privacy rights under the Fourteenth Amendment's due process clause. *Id*. at 455-56.

18         In *Grummett v. Rushen*, the Ninth Circuit held that the right to bodily privacy also applies

19   to inmates. 779 F.2d 391 (9th Cir. 1985). *Grummett* involved a class action filed by male prison

20   inmates alleging that the prison's practice of allowing female corrections officers to view male

21   inmates showering, disrobing, and using the toilet facilities violated their privacy rights. *Id*. at

22   492-93. The court held that the prisoners had a right to privacy in their naked body, although the

23   officials had not violated that right because the officials' view of the inmates was "restricted by

1    distance," "casual in nature," and justified by security needs. *Id*. at 494-96. The court held that

2    prison authorities had "devised the least intrusive means to serve the state's interests in prison

3    security," and therefore had not violated the inmates' right to bodily privacy. *Id*. at 494 (citing

4    *Wooley v. Maynard*, 430 U.S. 705, 716 (1977)).

5           Finally, in *Sepulveda v. Ramirez*, the Ninth Circuit held that a parole officer violated a

6    female parolee's right to bodily privacy when he entered the bathroom stall while the parolee

7    was providing a urine sample. 967 F.2d 1413, 1415-16 (9th Cir. 1992). The court distinguished

8    the facts in *Grummett*, holding that the parole officer's view of the parolee was "neither obscured

9    nor distant," and "far more degrading to [the parolee] than the situation faced by the inmates in

10   *Grummett*." *Id*. at 1416. The court held that parolee rights are even more extensive than those of

11   inmates, and therefore the parole officer had violated the parolee's bodily privacy rights. *Id*. at

12   1416.

13           2.     *Reasonableness of the Search*

14          With this clearly established law concerning the right to bodily privacy as a backdrop, the

15   Court's next inquiry is whether Defendants' search was unreasonable under the *Bell* framework.

16           a.     *Scope of the Intrusion*

17          During oral argument, Plaintiffs argued that the photographs taken by Officer Hauri and

18   Sgt. Johnson were highly intrusive because Ms. Katzenjammer was lying in bed in her hospital

19   room wearing only a hospital gown. Although the Court has not been provided with a copy or

20   detailed description of the photographs that were taken, Sgt. Johnson's case report reflects that

21   he and Officer Hauri located Ms. Katzenjammer in a hospital room and photographed her thigh

22   and abdomen. (Dkt. # 18 at 12.) Officer Hauri's declaration similarly reflects that they

23   photographed "the taser impact sites on his body and a slight contusion on his right shoulder."

(Dkt. # 17 (Hauri Decl.) at ¶ 13.) Plaintiff argues that Ms. Katzenjammer was particularly traumatized by learning that her naked body had been photographed without her knowledge or consent, and that those photographs were included with the police and criminal case records, because she was undergoing gender reassignment. (Dkt. # 34 at 24.)

The Court finds that the Defendants' search was highly intrusive. If Ms. Katzenjammer was indeed wearing only a hospital gown, which Defendants do not appear to dispute, then the Defendants presumably manipulated her unconscious body – including lifting her hospital gown and exposing her naked genitals – to photograph her abdomen and thigh. The Ninth Circuit has repeatedly recognized that the "naked body" is the most "basic subject of privacy." *York*, 324 F.2d at 455-56.

Importantly, Ms. Katzenjammer's privacy interests had not been reduced, because she was not under arrest or the subject of a search warrant. She had more right to bodily privacy than the prison inmates in *Grummett* or the parolee in *Sepulveda*. *See Grummett*, 779 F.2d at 492-93; *Sepulveda*, 967 F.2d at 1415-16. Ms. Katzenjammer was also undergoing gender reassignment, and therefore Defendants' conduct likely constituted cross-sex observation (rather than same-sex observation) like *York*, *Sepulveda*, and *Grummett*. Accordingly, this factor weighs in favor of Plaintiffs.

b.    *Manner of the Search*

Defendants do not provide any details regarding the manner of their search. However, as noted above, Sgt. Johnson's case report and Officer Hauri's declaration reflect that they photographed the taser impact sites on Ms. Katzenjammer's abdomen and thigh, as well as a contusion on her right shoulder. (Dkt. # 17 (Hauri Decl.) at ¶ 13; Dkt. # 18 at 12.) They also

1   apparently inspected the rest of Ms. Katzenjammer's naked body to search for additional

2   injuries, because Officer Hauri states that "I did not see any additional injuries." (*Id.*)

3         The Court presumes that such an inspection of Ms. Katzenjammer's body for injuries

4   would require lifting of her hospital gown, as well as manipulation of her unconscious body. For

5   example, to inspect Ms. Katzenjammer's back for injuries, Defendants likely had to turn her

6   over. *Compare Grummett*, 779 F.2d at 492-93 (holding that prison officials had not violated the

7   inmates' privacy rights where the female officials' view of the male inmates was "restricted by

8   distance, 'casual in nature,' and 'justified by security needs.'"). Defendants' view of Ms.

9   Katzenjammer's body was "neither obscured nor distant," and especially in light of their

10  presumed manipulation of her unconscious body to take photographs without her knowledge,

11  "far more degrading to [Ms. Katzenjammer] than the situation faced by the inmates in

12  *Grummett*." *Sepulveda*, 967 F.2d at 1415-16. Thus, even given the very limited evidence in the

13  record regarding the manner of the Defendants' search of Ms. Katzenjammer's body, this factor

14  weighs in favor of finding Defendants' search unreasonable.

15                  *c.    Justification for the Search*

16        As noted above, Officer Hauri and Sgt. Johnson justify their search on the grounds that

17  they were continuing their investigation relating to the officers' use of force at the apartment.

18  (Dkt. # 17 (Hauri Decl.) at ¶ 13; Dkt. # 18 at 12.)  During oral argument, defense counsel

19  explained that the Defendants' documentation of any taser impact sites on a suspect's body is

20  required by Bellingham Police Department policy, although that policy may not be memorialized

21  in writing.

22        Documentation of any injuries stemming from police officers' use of force against a

23  suspect for evidentiary purposes is a legitimate government interest. However, this factor would

weigh more strongly in Defendants' favor if Ms. Katzenjammer had been under arrest at the time of the search. However, Ms. Katzenjammer was only a subject of Defendants' investigation at the time. *See Ioanev. Hodges*, 903 F.3d 929, 935 (9th Cir. 2018) (holding that an IRS agent's justification for directing the wife of an individual being investigated for tax fraud to hold up her dress while she urinated in front of the agent was unreasonable, especially given "the fact that [she was] not detained" at the time and her husband was the subject of the agent's investigation). In addition, Officer Hauri and Sgt. Johnson were not searching for weapons, drugs, or evidence of a crime. Thus, this factor weighs only slightly in favor of Defendants.

### d.    Place Where the Search was Conducted

Finally, the Court finds that the fact that the search was conducted in Ms. Katzenjammer's hospital room makes this intrusion more egregious. The Ninth Circuit has held that suspects who have been placed under arrest do not have a reasonable expectation of privacy in their hospital room where the police have entered the room to search for evidence of the crime at issue. *See U.S. v. George*, 987 F.2d 1428, 1432 (9th Cir. 1993) (holding that a suspect who was involuntarily admitted to the hospital while suffering a drug overdose does not have a reasonable expectation of privacy in his hospital room). As defense counsel conceded at oral argument, however, Ms. Katzenjammer was not under arrest at the time of the search.

The Court finds that, in light of the fact that Ms. Katzenjammer was not under arrest, she had a reasonable expectation of privacy in her hospital room. Although Defendants could reasonably enter the room to interview her and request her consent to photograph any injuries, it was not reasonable for the officers to presume that they could photograph her unconscious, naked body absent her consent or a warrant based on probable cause.

Accordingly, the Court has weighed the scope, manner, justification, and place of the search, and drawing all reasonable inferences in Plaintiffs' favor, finds sufficient evidence that Defendants' actions were unreasonable and violated Ms. Katzenjammer's Fourth Amendment rights. Defendants' interest in documenting evidence of any injuries relating to the officers' deployment of the taser did not justify the scope or manner of the intrusion into Ms. Katzenjammer's most basic subject of privacy, her naked body. *See Ione*, 903 F.3d at 936. The Court recommends that Defendants' motion for summary judgment on this claim be denied, and Plaintiffs should be free to conduct further discovery on this issue.

Moreover, in light of the holdings from *Bell*, *York*, *Grummett*, and *Sepulveda*, a reasonable officer in Defendants' position would have known that their intrusion into Ms. Katzenjammer's bodily privacy at the hospital was unreasonable and violated her expectation of bodily privacy. *See Hope v. Pelzer,* 536 U.S. 730, 739-41 (2002) ("Officials can still be on notice that their conduct violates established law even in novel factual circumstances."). Plaintiffs properly met their burden of showing that under *Bell v. Wolfish*, Sgt. Johnson and Officer Hauri are not entitled to qualified immunity on this claim.

### E.    *Plaintiffs' First, Fifth, Eighth, and Fourteenth Amendment Claims*

#### 1.    *Plaintiffs' First Amendment Claim*

Plaintiffs allege that Defendants' use of force against them violated their right to freedom of expression under the First Amendment, including objecting to the conduct of police "without arrest and without violent response." (Dkt. # 1 at 18.)

Defendants argue that they are entitled to summary judgment on this claim because Plaintiffs have failed to make the required showing that the officers had a "retaliatory animus" against Plaintiffs' protected speech. (Dkt. #11 at 17) (citing *Lash v. Lemke*, 786 F.3d 1, 10 (D.C. Cir. 2014)). Defendants allege that the video shows the officers did not retaliate against Plaintiffs for

1  any protected speech, but rather, "the officers reacted to [Mr. Young]'s aggressive and unlawful

2  actions and [Ms. Katzenjammer]'s non-compliant and dangerous behavior." *(Id.)*

3      The first issue in a First Amendment retaliation claim on summary judgment is whether

4  the facts, taken in the light most favorable to the plaintiffs, show a violation of their First

5  Amendment rights. *See Ford v. City of Yakima,* 706 F.3d 1188, 1192 (9th Cir. 2013). To

6  establish a claim of retaliation in violation of the First Amendment, Plaintiffs must first show

7  that they engaged in protected "speech." Plaintiff must then show that the officers' "conduct

8  would chill a person of ordinary firmness from future First Amendment activity." *Id.* at 1193.

9  Finally, Plaintiffs must also present evidence that will allow them "to prove that the . . . desire to

10  chill [her] speech was a but-for cause of [the] allegedly unlawful conduct." *Id.*

11      "[T]he First Amendment protects a significant amount of verbal criticism and challenge

12  directed at police officers." *City of Houston, Tex. v. Hill,* 482 U.S. 451, 461 (1987); *Mackinney v.*

13  *Nielsen,* 69 F.3d 1002, 1007 (9th Cir. 1995). In fact, the freedom of individuals to verbally

14  express opposition to police action without risk of arrest is a "principal characteristic" of a free

15  state. *Hill,* 482 U.S. at 462–63.

16      Plaintiffs' claim for a retaliatory arrest in violation of the First Amendment fails because

17  Plaintiffs have not demonstrated that they engaged in speech protected under the First

18  Amendment. Ninth Circuit case law recognizes a distinction between verbal opposition to police

19  conduct, protected under the First Amendment, and conduct that physically obstructs police

20  officer action, which is not protected as "speech." In *Young v. City of Los Angeles,* 655 F.3d

21  1156 (9th Cir. 2011), plaintiff was arrested for refusing to comply with a law enforcement

22  officer's orders requesting that he reenter his vehicle during a traffic stop. *Id.* at 1170. Plaintiff

23  challenged his arrest on the grounds that his repeated statements of refusing to comply with the

officer's orders constituted free speech, and that the arrest therefore violated his First

1 Amendment rights. The Ninth Circuit held that plaintiff's arrest did not violate his right to free

2 speech under the First Amendment because plaintiff's complete refusal to obey the law

3 enforcement officer's lawful command was not an act of speech or expression protected by the

4 First Amendment. *Id.*

5   Here, Mr. Young was arrested for assaulting Officer Peña, and Ms. Katzenjammer was

6 ultimately charged with crimes of resisting arrest, obstruction, and sexual assault. The crime of

7 obstruction of justice makes it unlawful for an individual to engage in conduct that "willfully

8 hinders, delays, or obstructs" a law enforcement officer in the discharge of his official duties.

9 RCW 9A.76.020. While Plaintiffs were free to verbally criticize the police officers as they

10 carried out their official duties, Plaintiffs did not have a First Amendment right to engage in

11 conduct that physically obstructed law enforcement from carrying out their lawful duties of

12 responding to Ms. Petrova's 911 call reporting being a victim of sexual assault.

13   Finally, Plaintiffs do not explain what speech they believe constituted "protected speech,"

14 or what behavior on behalf of Defendants reflected a retaliatory animus. Plaintiffs have not

15 drawn the Court's attention to anything in the record suggesting that the use of force by the

16 Defendants was retaliatory in nature, and the Court is aware of no such evidence. The videos

17 reflect that the officers were consistently attempting to deescalate the conflict with Plaintiffs, all

18 the while issuing orders and speaking to the Plaintiffs respectfully. (Dkt. # 12, Ex. C; Dkt. # 42,

19 Ex. A.) The Court did not discern any conduct or statement by Defendants that seemed to

20 suggest that the use of force in this case was the product of a retaliatory animus on the part of the

21 officers. Plaintiffs' refusal to comply with numerous lawful requests by the law enforcement

22 officers in this case was not an act of expression protected by the First Amendment, but rather a

23 failure to obey a police officer's lawful instructions. *See Young,* 655 F.3d at 1170. Accordingly,

1  the Court recommends that Defendants' motion for summary judgment on Plaintiffs' First

2  Amendment claim be granted.

3                    2.      *Plaintiffs' Fifth and Eighth Amendment Claims*

4          Defendants argue that Plaintiffs' Fifth Amendment claim (and related equal protection

5  claim) should be dismissed because the Fifth Amendment only applies to federal actors. (Dkt. #

6  11 at 16 (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 698 (9th Cir. 2001) ("The Due Process

7  Clause of the Fifth Amendment and the equal protection component thereof apply only to actions

8  of the federal government – not to those of state or local governments.")). The Court agrees. The

9  Fifth Amendment provides due process protection for the bodily integrity of citizens from harm

10 imposed by federal actors. Plaintiffs do not allege that any of the Defendants are federal actors,

11 and therefore the Court recommends that Defendants' motion for summary judgment on

12 Plaintiffs' Plaintiffs' Fifth Amendment claim be granted.

13          Similarly, with respect to Plaintiffs' Eighth Amendments claims, Defendants argue that

14 the Eighth Amendment only applies after conviction and sentence. (Dkt. # 11 at 17.) Defendants

15 are correct. Neither Plaintiff in this case were prisoners or were subjected to "cruel and unusual

16 punishment." *Id.* at 17 (citing *Lee*, 250 F.3d at 686). Accordingly, the Court recommends that

17 Defendants' motion for summary judgment on Plaintiffs' Eighth Amendment claim be granted as

18 well.

19                    3.      *Plaintiffs' Fourteenth Amendment Claims*

20          Plaintiffs allege that Officers Peña, Sturlaugson and Hauri violated their Fourteenth

21 Amendment rights, apparently claiming a violation of substantive due process and equal

22 protection rights through discriminatory policing. (Dkt. #1 at 18.) The Fourteenth Amendment

23 protects individuals from deprivations of property or liberty without due process of law. *Roley v.*

*Pierce County Fire Protection Dist. No.* 4., 869 F.2d 490, 494 (9th Cir. 1989). Procedural due process requires an opportunity to be heard in a meaningful time and manner. *Id.* Substantive due process prevents the government from engaging in conduct that shocks the conscience or is offensive to the point that it violates traditional notions of fair play and decency. *County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998).

Plaintiffs' substantive due process claim under the Fourteenth Amendment fails for several reasons. First, "[w]here a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994), *quoting Graham v. Connor*, 490 U.S. 386, 395 (1989). Pretrial deprivations of liberty are governed by the Fourth Amendment, not by substantive due process. *Albright*, 510 U.S. at 274. Additionally, substantive due process claims do not arise through a law enforcement officer's arrest or other seizure, where the Fourth Amendment controls. *See e.g. Cnty of Sacramento v. Lewis*, 523 U.S. 833, 844-45 (1998).

Second, even if substantive due process claims could be brought under these circumstances, Plaintiffs have failed to oppose Defendants' motion for summary judgment on this claim or meaningfully articulate the basis of their claim. The officers had probable cause to arrest both Plaintiffs for obstruction of justice if they had wished to do so. Plaintiffs also do not allege any facts suggesting they have not had a full and fair opportunity to be heard. The Court recommends that Defendants' motion for summary judgment on Plaintiffs' substantive due process claim be granted.

Finally, Plaintiffs' claims under the equal protection clause of the Fourteenth Amendment fail because there is no proof of discriminatory intent and motive. In *Washington v. Davis*, 426

U.S. 229 (1976), the Supreme Court held that official action will not be held unconstitutional solely because it results in a racially disproportionate impact. Rather, proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *Village v. Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 (1977). Plaintiffs must show Defendants took action with the intent to discriminate based upon membership in a protected class. *Lee*, 250 F.3d at 686.

Here, Plaintiffs have failed to point to any evidence that the Defendants were aware that Plaintiffs belonged to a protected class, let alone that their conduct was racially motivated. Plaintiffs simply allege that they believe they were targeted because of their First Nations status. However, Plaintiffs fail to discuss any particular reference by Defendants to Plaintiffs' nationality, or identify any conduct that suggests discriminatory intent.[8] The Court also fails to discern any such reference or conduct on the videos. (Dkt. # 12, Ex. C; Dkt. # 42, Ex. A.)

Without more, Plaintiffs' conclusory belief that their national origin was a factor in Defendants' treatment towards them is insufficient to support an equal protection claim. Accordingly, the Court recommends that Defendants' motion for summary judgment on Plaintiffs' Fourteenth Amendment claims be granted.

---

[8] Plaintiffs also claim they had a previous encounter with Officers Peña and Sturlaugson at an Industrial Credit Union earlier that same day, when the two officers approached them in a threatening and belligerent manner for an unknown reason. (Dkt. # 35 (Young Decl.) at ¶¶ 26-29; Dkt. # 36 (Katzenjammer Decl.) at ¶¶ 26-29.) However, Plaintiffs do not explain how this alleged encounter relates to their equal protection claim. Moreover, Defendants have provided evidence that they had no previous interaction with the Plaintiffs, as they were only assigned to work the evening shift that day and had been on patrol for only about fifteen minutes before Ms. Petrova's 911 call came in. (Dkt. # 42 (2nd Sturlaugson Decl.) at ¶ 7); Dkt. # 43 (2nd Peña Decl.) at ¶ 7). Defendants' account is consistent with the June 2, 2016 shift schedule from Defendants' supervisor. (Dkt. # 44, Ex. A.)

4.    *Supervisory Liability Claim against Sgt. Johnson*

Plaintiffs contend that Sgt. Dave Johnson "encouraged" and "endorsed" City policies that lead to violations of Plaintiffs' civil rights. (Dkt. #1 at 19-21.) Supervisors can only be liable for their own actions on constitutional claims, and cannot be liable under a theory of *respondeat superior. See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Sgt. Johnson can only be liable as a supervisor if he (1) was personally involved in a constitutional deprivation; or (2) there is sufficient causal connection between his wrongful conduct and the constitutional violation. *See Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). A "causal connection" requires a showing that the supervisor set in motion a series of acts by others or knowingly refusing to terminate a series of acts by others which the supervisor knew or reasonably should have known would cause others to inflict constitutional injury. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011).

Plaintiffs' supervisory liability claims with respect to Sgt. Johnson's conduct at the apartment complex and the use of force against Plaintiffs fail. As his body camera videos show, Sgt. Johnson was not personally involved in the incident preceding the use of force, and there is no evidence he acted with a discriminatory purpose or adopted or implemented discriminatory policies. *See Starr*, 652 F.3d at 1206.

However, Sgt. Johnson did personally participate in Officer Hauri's unreasonable documentation of Ms. Katzenjammer's injuries at the hospital. Sgt. Johnson accompanied Officer Hauri to the hospital, and presumably assisted him as he took the pictures. During oral argument, defense counsel also stated that these pictures were taken in accordance with the police department's policy, although that policy may not actually be memorialized in writing.

1    Accordingly, the Court finds that genuine issues of material fact remain as to whether

2    Sgt. Johnson is liable in his supervisory capacity for his conduct regarding the photographs taken

3    of Ms. Katzenjammer at the hospital. The Court recommends that Plaintiffs be permitted to

4    conduct further discovery related to this issue, and that Defendants' motion for summary

5    judgment on this claim be denied.

6                    5.      *Monell Liability*

7    Plaintiffs claim that the City of Bellingham is liable for failing to adequately train its

8    officers. (Dkt. # 1 at 20.) As mentioned above, during oral argument defense counsel represented

9    that when Officer Hauri and Sgt. Johnson photographed Ms. Katzenjammer's injuries at the

10   hospital, they were acting in accordance with the police department's policy to document all

11   injuries stemming from officers' use of force. Defense counsel did not know whether this policy

12   was memorialized in writing.

13   "[A]s to a municipality, 'the inadequacy of police training may serve as the basis for §

14   1983 liability only where the failure to train amounts to deliberate indifference to the rights of

15   persons with whom the police come into contact.'" *Flores v. Cnty. of Los Angeles*, 758 F.3d

16   1154, 1158 (9th Cir. 2014) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). A

17   plaintiff "must demonstrate a 'conscious'or 'deliberate' choice on the part of a municipality in

18   order to prevail on a failure to train claim." *Id.* at 1158 (quoting *Price v. Sery*, 513 F.3d 962, 973

19   (9th Cir. 2008)).

20   Given the early stage of this litigation, Defendants' motion for summary judgment on

21   Plaintiffs' municipal liability claim should be denied. Plaintiffs should have an opportunity to

22   conduct further discovery regarding the issue of whether the City of Bellingham has a policy or

23

REPORT AND RECOMMENDATION - 40

1  practice of photographing the subjects of their investigation, regardless of whether the subject is

2  under arrest, and without first obtaining consent or a warrant supported by probable cause.

3       **F.**    **Plaintiffs' State Law Claims**

4            *1.*    *Malicious Prosecution*

5       Plaintiffs also allege that Defendants are liable for malicious prosecution. In order to

6  prevail on a § 1983 claim of malicious prosecution, a plaintiff "must show that the defendants

7  prosecuted [him] with malice and without probable cause, and that they did so for the purpose of

8  denying [him] equal protection or another specific constitutional right." *Awabdy v. City of*

9  *Adelanto,* 368 F.3d 1062, 1066 (9th Cir. 2004) (internal citations omitted). In order to bring a

10  malicious prosecution claim under Washington state law, a plaintiff must allege: "(1) that the

11  prosecution claimed to have been malicious was instituted or continued by the defendant; (2) that

12  there was want of probable cause for the institution or continuation of the prosecution; (3) that

13  the proceedings were instituted or continued through malice; (4) that the proceedings terminated

14  on the merits in favor of the plaintiff, or were abandoned; and (5) that the plaintiff suffered injury

15  or damage as a result of the prosecution." *Clark v. Baines,* 150 Wash.2d 905, 911, 84 P.3d 245

16  (2004) (internal quotation marks and citations omitted).

17       Even viewing the facts in the light most favorable to Plaintiffs, Defendants had sufficient

18  probable cause to arrest Ms. Katzenjammer for obstruction and resisting arrest for her conduct

19  captured on the video. Similarly, Defendants had probable cause to arrest Mr. Young for

20  assaulting Officer Peña. Accordingly, the Court recommends that Defendants' motion for

21  summary judgment on Plaintiffs' malicious prosecution claim be granted.

22

23

1

2.    *Assault and Battery*

2    Under Washington law, "a police officer making an arrest is justified in using sufficient

3    force to subdue a prisoner, however, he becomes a tortfeasor and is liable as such for assault and

4    battery if unnecessary violence or excessive force is used in accomplishing the arrest." *Boyles v.*

5    *City of Kennewick,* 62 Wash. App. 174, 176, 813 P.2d 178 (1991).

6    Even viewing the evidence in the light most favorable to Plaintiffs, the Court

7    recommends that Defendants be granted summary judgment on this claim. As discussed in great

8    detail above with respect to Plaintiffs' excessive force claims, Plaintiffs have not shown that the

9    officers used more force than necessary to accomplish the arrest of Mr. Young or to subdue Ms.

10    Katzenjammer.

11    3.    *False Arrest and False Imprisonment*

12    Under Washington law, "probable cause is a complete defense to an action for false arrest

13    and imprisonment." *Hanson v. City of Snohomish,* 121 Wash.2d 552, 563, 852 P.2d 295 (1993).

14    As discussed above, Defendants had probable cause to arrest Mr. Young for felony assault on a

15    police officer, and Ms. Katzenjammer for obstruction, resisting arrest, and sexual assault in the

16    fourth degree. Accordingly, the Court recommends that Defendants' motion for summary

17    judgment on Plaintiffs' false arrest and false imprisonment claims be granted.

18    4.    *"Zone of Privacy" claims*

19    Plaintiffs allege that the officers violated their "right to be free from invasion and

20    interference with their zone of privacy" when they entered the apartment to investigate Ms.

21    Petrova's sexual assault complaint. (Dkt. #1 at p. 18.) Plaintiffs' claim appears to be based upon

22    the fact that the officers entered Mr. Young's apartment at the invitation of one of the occupants,

23    Isabella Petrova, without first verifying her identity. (*Id.*)

1    The United States Supreme Court has recognized that zones of privacy may be created by

2    specific constitutional guarantees that impose limits on governmental power. *Grummett*, 779

3    F.2d at 493. Guarantees to personal privacy have been limited to personal decision-making

4    related to certain matters, "such as marriage, procreation, contraception, abortion, family

5    relationships, child rearing and education." *Id*. at 495.  *See also Paul v. Davis*, 424 U.S. 693, 713

6    (1976).

7    Although Plaintiffs' zone of privacy claim is not entirely clear, it is clear from the facts

8    alleged in the complaint that there is no support for a zone of privacy claim. A criminal

9    investigation does not fall within any of the recognized substantive areas. Defendants are also

10   entitled to qualified immunity on this claim because Plaintiff has not cited any authority that

11   clearly establishes that an officer's response to a 911 call, investigation of that complaint, and

12   subsequent use of force violates a suspect's "zone of privacy." Accordingly, the Court

13   recommends that Defendants' motion for summary judgment on Plaintiffs' zone of privacy claim

14   be granted.

15         *5.*   *Intentional Infliction of Emotional Distress (Outrage)*

16    The tort of outrage, also known as intentional infliction of emotional distress, "requires

17   proof of three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction

18   of emotional distress, and (3) actual result to plaintiff of severe emotional distress." *Kloepfel v.*

19   *Bokor,* 149 Wash.2d 192, 195, 66 P.3d 630 (2003). "Any claim of outrage must be predicated on

20   behavior so outrageous in character, and so extreme in degree, as to go beyond all possible

21   bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

22   community." *Strong v. Terrell,* 147 Wash.App. 376, 385, 195 P.3d 977 (2008) (internal

23   quotation marks and citations omitted).

1   "The elements of outrage generally are factual questions for the jury." *Sutton v. Tacoma*

2   *Sch. Dist. No. 10,* 180 Wash.App. 859, 869, 324 P.3d 763 (2014). "However, a trial court faced

3   with a summary judgment motion must make an initial determination as to whether the conduct

4   may reasonably be regarded as so 'extreme and outrageous' as to warrant a factual determination

5   by the jury." *Id.* (internal quotation marks and citations omitted). A court may consider several

6   factors, including: (1) the position the defendant occupied; (2) whether the plaintiff was

7   particularly susceptible to emotional distress and the defendant was aware of the susceptibility;

8   (3) whether the defendant's conduct was privileged; (4) whether the degree of emotional distress

9   was severe as opposed to merely annoying, inconvenient or embarrassing; and (5) whether the

10   defendant was aware of a high probability that his or her conduct would cause severe emotional

11   distress, and consciously disregarded that probability. *Id.* at 870. Whether conduct qualifies as

12   "extreme and outrageous" is a question for the fact-finder to determine. *Gravelet–Blondin v.*

13   *Shelton,* 728 F.3d 1086, 1100 (9th Cir. 2013).

14   Viewing the facts in the light most favorable to Plaintiffs, the Court finds that Sgt.

15   Johnson and Officer Hauri's conduct in photographing Ms. Katzenjammer in the hospital could

16   potentially satisfy the requisite elements for this claim. As discussed in detail above, the officers

17   should have known that it was unlawful to photograph the naked and unconscious body of the

18   subject of an investigation who was not under arrest. Plaintiffs should be allowed to conduct

19   further discovery related to the officers' conduct at the hospital to potentially support such a

20   claim. The Court therefore recommends that Defendants' motion for summary judgment on this

21   claim be denied.

22   ### V.     CONCLUSION

23   For the foregoing reasons, this Court RECOMMENDS that Defendants' motion for

REPORT AND RECOMMENDATION - 44

summary judgment on Plaintiff's § 1983 and state law claims be GRANTED IN PART and DENIED IN PART. (Dkt. # 11.) Specifically, the Court recommends that Defendants' motion be GRANTED with respect to Plaintiffs' excessive force claims under the Fourth Amendment, as well as their claims for violations of the First, Fifth, Eighth, and Fourteenth Amendments, malicious prosecution, assault and battery, false arrest and imprisonment, and violation of their "zone of privacy." The Court further recommends that Defendants' motion for summary judgment be DENIED with respect to Plaintiffs' claims that Sgt. Johnson and Officer Hauri conducted an unreasonably invasive search of Ms. Katzenjammer's body in violation of the Fourth Amendment, and the related claims for supervisory liability, municipal liability, and intentional or reckless infliction of emotional distress.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **fourteen (14)** days after the filing of this Report and Recommendation. Objections, and any response, shall not exceed seven pages. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motion calendar **fourteen (14)** days after they are served and filed. Responses to objections, if any, shall be filed no later than **fourteen (14)** days after service and filing of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on the date that objections were due.

The Clerk is directed to send copies of this order to the parties and to the Honorable James L. Robart.

Dated this 28th day of June, 2019.

MICHELLE L. PETERSON
United States Magistrate Judge