UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DANIEL YOUNG, et al., | CASE NO. C18-1007JLR-MLP |
| Plaintiffs, | ORDER ADOPTING IN PART |
| v. | AND REJECTING IN PART |
| | REPORT AND |
| PATRICK E. PENA, et al., | RECOMMENDATION |
| Defendants. | |

## I.  INTRODUCTION

This matter comes before the court on the report and recommendation of United States Magistrate Judge Michelle L. Peterson (R&R (Dkt. # 50)) and Defendants Patrick Pena, Nicolas Sturlaugson, Travis Hauri, David Johnson, and City of Bellingham's (collectively, "Defendants") objections thereto (Obj. (Dkt. # 52)).  Plaintiffs Daniel Young[1] and Richard Young (collectively, "Plaintiffs") did not file objections or a

---

[1] Since the time of the events at issue, Daniel Young became known as Katherine Wren Katzenjammer.  The court refers to Ms. Katzenjammer by her chosen name unless it is necessary

response to Defendants' objections.  (*See* Dkt.)  Having carefully reviewed the foregoing, the relevant portions of the record, and the applicable law, the court ADOPTS in part and REJECTS in part the report and recommendation.

## II.    BACKGROUND

In June 2016, Mr. Young, a 65-year-old First Nations man, was renting a two-bedroom apartment in Bellingham, Washington.  (Young Decl. (Dkt. # 35) ¶¶ 2-3, 9.)  Mr. Young had three roommates at the time, although only one of his roommates was identified on the lease.  (*Id.* ¶¶ 10-19.)  According to Mr. Young, each of his roommates went by numerous false names.  (*Id.* ¶¶ 12, 15-16, 17.)  Mr. Young's longtime acquaintance, Heather (who was identified by a false name on the lease), Heather's daughter, Ashley (who was going by the name "Isabella Petrova"), and Ashley's brother (or boyfriend), Andrew Albers, were all living in the apartment with Mr. Young.  (*Id.*)  On June 2, 2016, Mr. Young's daughter, Ms. Katzenjammer, visited Mr. Young at the apartment, but she did not live there.  (*Id.* at ¶¶ 25, 30.)

Defendants Patrick Pena and Nicolas Sturlaugson, who are both City of Bellingham Police Officers, were on patrol in the same vehicle when they responded to a 911 call around 9:15 p.m. that evening.  (12/3/18 Sturlaugson Decl. (Dkt. # 12) ¶ 3; Pena Decl. (Dkt. # 13) ¶ 3.)  A woman who identified herself to the 911 dispatcher and police officers as Isabella Petrova reported that "Daniel" (Ms. Katzenjammer) was drunk and starting fights at her apartment.  (12/3/18 Sturlaugson Decl. ¶ 3, Ex. A ("CAD Report").)

---

to accurately quote statements from the record.  Further, the court's references to "Mr. Young" refer to Richard Young, not Daniel Young.

She further reported that Ms. Katzenjammer was groping her and her friends, had broken a glass, and was laying on the ground screaming. (12/3/18 Sturlaugson Decl. ¶ 4.) Ms. Petrova waited outside with a friend for the officers to arrive. (*Id.* ¶¶ 4-5.)

When Officers Pena and Sturlaugson arrived at the apartment complex, they contacted Ms. Petrova in the parking lot. (*Id.* ¶ 4.) She once again reported that Ms. Katzenjammer was inside the apartment with Mr. Young. (*Id.* ¶ 5.) Ms. Petrova identified Mr. Young to the officers as her uncle, although they are not related. (*Id.*) She again reported that Ms. Katzenjammer was intoxicated and had groped her and her friend. (*Id.*) Ms. Petrova reported that she lives at the apartment with her brother and Mr. Young, and asked the officers to remove Ms. Katzenjammer. (*Id.*; Pena Decl. ¶ 4.)

Ms. Petrova then walked Officers Pena and Sturlaugson to the apartment and let them in. (4/26/19 Sturlaugson Decl. (Dkt. # 42) ¶ 8, Ex. A ("Video Recording").) When they entered the apartment, Mr. Young was sitting upright on a couch in the living room. (*Id.*) Ms. Katzenjammer was kneeling on the living room floor to the right of the officers. (*Id.*) Officer Pena immediately stated, "[h]ey guys" and "[a]re you Daniel?" as he looked at Ms. Katzenjammer. (*Id.*) Officer Pena told Ms. Katzenjammer the reason the officers were there and explained, "if you are Daniel, we are just here to ask you to leave." (*Id.*) He told Ms. Katzenjammer that "other people that live here" and that "apparently you've been causing a ruckus, you are too drunk they want you out." (*Id.*) Officer Pena asked Ms. Katzenjammer to come outside to talk. (*Id.*)

At this point, Mr. Young and Ms. Katzenjammer began questioning the officers as to who wanted Ms. Katzenjammer to leave the apartment. (*Id.*) Ms. Petrova responded,

"[r]ight here." (*Id*.) Officer Pena then asked if Ms. Katzenjammer wanted to speak outside, at which point Mr. Young stood up and walked quickly towards Officer Pena saying "[s]ure, I want to talk to this human being." (*Id*.) When the officers informed Mr. Young that they did not need to talk to him and he could sit down, Mr. Young said, "you don't?" and then raised his arms and reached towards Officer Pena's chest or collar. (*Id*.) In the video, Mr. Young appears intoxicated and hostile. (*Id*.)

Officer Pena then pushed Mr. Young away, forcing Mr. Young back a few feet, and issued verbal warnings to stop or Mr. Young could be tased. (*Id*.) After a short pause, Mr. Young again took several steps towards Officer Pena. (*Id*.) Officer Sturlaugson then deployed his taser in "dart mode." (*Id*.) The taser prongs impacted Mr. Young in his thigh, causing him to fall backwards abruptly, close to where Ms. Katzenjammer was still kneeling on the floor. (*Id*.) Taser records reflect that the taser cycled one time for five seconds. (Starkovich Decl. (Dkt. # 15) ¶¶ 6-7, Ex. A.) Mr. Young remained on the ground after being tased, but continued to argue with the officers. (Video Recording.)

The parties have different versions of what happened next between Ms. Katzenjammer and the officers, and the video does not resolve the factual dispute because only Ms. Katzenjammer's torso and above are visible. (*Id*.) Officers Pena and Sturlaugson assert that Mr. Young was lying on the ground with the taser wires from Officer Sturlaugson's taser still extending from the probes attached to his leg. (12/3/18 Sturlaugson Decl. ¶ 9; Pena Decl. ¶ 8.) After Ms. Katzenjammer told the officers that Mr. Young had a serious medical condition, Officer Sturlaugson said, "we aren't trying to

hurt him, but he can't hurt us." (Video Recording.) By this point, Officer Pena drew his

taser and told Ms. Katzenjammer to "sit down, get away." (*Id*.) Defendants claim that,

after the taser cycle was complete, Ms. Katzenjammer attempted to break the wires

connecting Officer Sturlaugson's taser to the probes in Mr. Young's thigh. (12/3/18

Sturlaugson Decl. ¶ 9; Pena Decl. ¶ 8.) Officer Sturlaugson asserts that he was concerned

that if the taser wires were broken, he would lose the ability to control Mr. Young if he

became violent. (12/3/18 Sturlaugson Decl. ¶ 8.) In addition, Officer Pena asserts that

his path to Ms. Katzenjammer was obstructed by Mr. Young's body, the taser wires from

Officer Sturlaugson's taser, and a coffee table. (Pena Decl. ¶ 8.)

   In contrast, Ms. Katzenjammer claims that she did not touch the taser wires

attached to Mr. Young, and remained kneeling on the floor. (Katzenjammer Decl. (Dkt.

# 36) ¶ 81.) In the video recording, Officer Pena does not explicitly mention the taser

wires in his instructions to Ms. Katzenjammer, but continues to warn her that if she does

not sit back on the couch, she will get tased. (Video Recording.) Ms. Katzenjammer

appears intoxicated and defiant, and is non-compliant with Officer Pena's directive. (*Id*.)

The video, however, does not show Ms. Katzenjammer's hands, or whether she was

attempting to remove the taser wires from her father's thigh. (*Id*.)

   After Ms. Katzenjammer failed to comply with Officer Pena's repeated orders,

Officer Pena warned, "you're going to get tased, you're going to get tased." (Video

Recording.) Ms. Katzenjammer responded, "[y]ou can tase the fuck out of me and I will

make weird things happen for your life." (*Id*.; Pena Decl. ¶ 9.) Officer Pena then said,

"you need to get back and sit on the couch," to which Ms. Katzenjammer responded,

"no." (Video Recording.) Officer Pena then deployed his taser in dart mode at Ms. Katzenjammer. (Pena Decl. ¶ 11.)

According to the video, the taser did not appear to incapacitate Ms. Katzenjammer at first because she began wrapping the taser wires around her hand. (Video Recording.) Officer Pena deployed his taser a second time, which momentarily incapacitated Ms. Katzenjammer. (Pena Decl. ¶ 11.) Taser data shows that Officer Pena's first taser cycle lasted five seconds, and the second taser deployment occurred immediately thereafter for another five seconds. (Starkovich Decl. ¶ 8.) The officers then physically restrained Mr. Young and Ms. Katzenjammer. (Video Recording.)

Before Plaintiffs were in handcuffs, Officer Travis Hauri arrived at the scene. (Hauri Decl. (Dkt. # 17) ¶ 5.) Officer Hauri began to subdue Ms. Katzenjammer, who was struggling and resisting the handcuffs. (*Id.*) Officers Sturlaugson and Pena then handcuffed Mr. Young as additional officers arrived on the scene. (Video Recording.) The entire incident in the apartment—from the officers' arrival to both Plaintiffs being in handcuffs—lasted about four minutes. (*Id.*)

After Officer Sturlaugson walked Mr. Young out of the apartment to the patrol vehicle, Officer Pena asked Mr. Young to confirm the identity of "Daniel." (*Id.*) During that conversation, Officer Pena explained that Mr. Young would have been able to stay in his apartment but "you rose up at me." (*Id.*) Mr. Young was arrested for felony assault in the third degree for assaulting Officer Pena and transported to the Whatcom County Jail. (12/3/18 Sturlaugson Decl. ¶¶ 16-17; Pena Decl. ¶ 14.)

//

Ms. Katzenjammer remained uncooperative, and eventually medics on the scene administered medication to sedate her. (Video Recording; Hauri Decl. ¶ 11.) Ms. Katzenjammer then fell asleep on the gurney and was taken to St. Joseph's Hospital for treatment. (*Id.*) Ms. Katzenjammer was never placed under arrest; nor was she transported to the Whatcom County Jail like Mr. Young. (Pena Decl. ¶ 19.)

Officer Hauri then went to the Emergency Department at St. Joseph Hospital with his supervisor, Sgt. David Johnson, to speak with Ms. Katzenjammer about the incident. (Johnson Decl. (Dkt. # 18) ¶ 11.) However, Officer Hauri and Sgt. Johnson found Ms. Katzenjammer "unconscious and unable to answer any questions about the incident." (*Id.*) According to Sgt. Johnson, "as part of the investigation, at the hospital Officer Hauri photographed the taser impact sites on Daniel Young's body." (*Id.*) According to Sgt. Johnson's Longarm Case Report:

> Investigator Hauri and I went to the Emergency Department at St Joseph Hospital and located DANIEL YOUNG (C1) who was unconscious in one of the rooms. A nurse advised that the taser probes had already been removed from DANIEL YOUNG (C1), but she had noted that three taser probes that contacted his abdomen and one had contacted his thigh. Investigator Hauri photographed the possible locations where the probes had contacted DANIEL YOUNG (C1). DANIEL YOUNG (C1) was unconscious during this entire process and we were unable to ask him any questions.

(*Id.* ¶ 12, Ex. A ("Johnson Report") at 4.) Officer Hauri has a similar account of the hospital visit:

> I then went to the hospital to continue the investigation. I arrived at the hospital to find that Daniel Young was unconscious. He was thus unable to be interviewed about the criminal incident. As part of the investigation, I photographed the taser impact sites on his body and a slight contusion on his

right shoulder.  I did not see any additional injuries.  Daniel was left at the hospital and was not booked into jail.

(Hauri Decl. ¶ 13.)

Although neither party included the photographs in the record, it is undisputed that Officer Hauri photographed, at a minimum, Ms. Katzenjammer's abdomen, thigh, and right shoulder in a hospital room while she was the subject of an investigation but was not under arrest.  (Johnson Decl. ¶ 11; Hauri Decl. ¶ 13; Compl. (Dkt. # 1) ¶ 3.37.)  It is also undisputed that Ms. Katzenjammer was unconscious when the photographs were taken and could not consent to their occurrence.  (*Id.*)

Ms. Katzenjammer was later charged with several misdemeanors, including assault in the fourth degree with sexual motivation, obstructing law enforcement, and resisting arrest.  (Brady Decl. (Dkt. # 14) ¶ 4, Ex. B.)  The criminal charges against both Plaintiffs were eventually dismissed under deferred prosecution agreements with the respective prosecutors' offices.  (*Id*. ¶ 8, Ex. F.)

On July 1, 2018, Plaintiffs brought this lawsuit seeking damages from the Defendants for numerous state and federal claims.  (*See generally* Compl.)  On December 3, 2018, Defendants filed a motion for summary judgment seeking dismissal of all of Plaintiffs' claims.  (MSJ (Dkt. # 11).)  Plaintiffs filed their response after receiving numerous extensions of time.  (Resp. (Dkt. # 34); *see also* 4/15/19 Order (Dkt. # 33) at 2 ("This is now Plaintiffs' fourth extension to respond to Defendants' pending summary judgment motion").)  Defendants filed a reply.  (Reply (Dkt. # 40).)

//

On May 23, 2019, before the court ruled on Defendants' pending summary judgment motion, the court reassigned the matter to Magistrate Judge Michelle L. Peterson.  (Min. Order (Dkt. # 46).)  On June 18, 2019, Magistrate Judge Peterson held a hearing on Defendants' motion.  (Min. Entry (Dkt. # 49).)  Magistrate Judge Peterson issued a report and recommendation on June 28, 2019, granting in part and denying in part Defendants' motion.  (*See* R&R.)  On July 11, 2019, Defendants filed objections to Magistrate Judge Peterson's recommendations to deny summary judgment on (1) Ms. Katzenjammer's Fourth Amendment privacy claims, (2) Plaintiffs' *Monell*[2] claim, and (3) Plaintiffs' claim for outrage/intentional infliction of emotional distress.  (*See generally* Obj.)  Plaintiffs did not file objections to the report or recommendations or file a response to Defendants' objections.  (*See* Dkt.)  The court will address Defendants' objections in turn.

### III.    ANALYSIS

**A.    Legal Standards**

"The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).  "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3).  The court reviews de novo those portions of the report and recommendation to which specific written objection is made.  *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121

---

[2] *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978).

(9th Cir. 2003) (en banc) (discussing 28 U.S.C. § 636(b)(1)). "The statute makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo if objection is made, but not otherwise." *Id.* When no objections are filed, the court need not review de novo the report and recommendation. *Wang v. Masaitis*, 416 F.3d 992, 1000 n.13 (9th Cir. 2005).

**B.      Fourth Amendment Privacy Claim**

Defendants object to two portions of Magistrate Judge Peterson's recommendation regarding Plaintiffs' Fourth Amendment privacy claim. (*See* Obj. at 2-5.) First, Defendants assert that the report and recommendation relies on facts that are not in the record. (*Id.* at 2.) Specifically, Defendants argue that the report and recommendation improperly "'presumed' that Ms. Katzenjammer was naked when the officers photographed her injuries, the officers 'manipulated' her body to take photographs, and Ms. Katezenjammer [sic] was undergoing gender affirmation and that the officers therefore 'likely' performed a cross-gender observation." (*Id.* (citing R&R at 30-31).) Defendants further assert that the only mention of nakedness in the record is inadmissible because it comes from Ms. Katzenjammer's declaration and she was unconscious when Defendants took the photographs. (*Id.* at 3.) Second, Defendants argue that Magistrate Judge Peterson erred by not affording them qualified immunity. (*Id.* at 3-5.)

The court first concludes that the report and recommendation properly relied on matters in the record. Ms. Katzenjammer attests in her declaration, "[w]hile I was in the hospital and unconsciousness [sic], the Bellingham Police Department came and manipulated my naked body in order to take pictures." (Katzenjammer Decl. (Dkt. # 36)

¶ 106.)  She further states, "I am an extremely private person.  To have had pictures taken of me while I was unconscious – having been sedated on the recommendation of the police – is extremely humiliating."  (*Id.* ¶ 110.)

Defendants have never disputed that Ms. Katzenjammer was wearing only a hospital gown at the time the pictures were taken.  (*See* Tr. (Dkt. # 51) at 7:24-8:5.)  Further, Sgt. Johnson's case report and Officer Hauri's declaration reflect that they photographed the taser impact sites on Ms. Katzenjammer's "abdomen" and "thigh," as well as a "contusion on [her] right shoulder."  (Johnson Report at 4; Hauri Decl. ¶ 13.)  Officer Hauri also appears to have inspected the rest of Ms. Katzenjammer's body, stating, "I did not see any additional injuries." (*Id.*)

Viewing the evidence in the light most favorable to Plaintiffs, the report and recommendation correctly "presumes" that, to photograph Ms. Katzenjammer's lower abdomen, the officers needed to move Ms. Katzenjammer's hospital gown to expose her abdomen and thigh.  (R&R at 30.)  This likely exposed her genitals.  The report and recommendation also correctly finds that the officers may have needed to manipulate Ms. Katzenjammer's unconscious body to search for and photograph the injuries.  (*Id.* at 31.)

Plaintiffs' counsel explained at oral argument that Plaintiffs are not arguing that Ms. Katzenjammer was entirely naked, but that the officers necessarily lifted or moved her gown in a way that exposed her genitals.  (Tr. at 12:14-13:21.)  Defense counsel did not make any argument to the contrary, agreeing that Ms. Katzenjammer "was wearing a hospital gown," but arguing there was no evidence the officers "removed any clothes from her."  (*Id.* at 8:24-9:5.)  The report and recommendation recognized the distinction

in Plaintiffs' argument, as well as Defendants' counterargument, and viewed the evidence correctly at the summary judgment stage.

Moving to Defendants' argument regarding qualified immunity: Police officers "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether a police officer is entitled to qualified immunity, the court must decide: (1) whether the facts that the plaintiff alleges assert a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time the defendant engaged in the misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (discussing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). To determine whether a right was clearly established, "the standard is one of fair warning: where the contours of the right have been defined with sufficient specificity that a state official had fair warning that [his] conduct deprived a victim of his rights, [he] is not entitled to qualified immunity." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003) (quotation marks and citation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). Where a "genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the

case must proceed to trial." *Bonivert v. Clarkson*, 883 F.3d 865, 871-72 (9th Cir. 2017). Courts may consider the two prongs of the qualified immunity analysis in any order. *See Chism v. Washington*, 661 F.3d 380, 386 (9th Cir. 2011).

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767 (1966). "[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Id.* at 768. "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *United States v. Knights*, 534 U.S. 112, 118-19 (2001) (quoting *Wyoming v. Houghton,* 526 U.S. 295, 300 (1999)).

Magistrate Judge Peterson reviewed the photographing of Ms. Katzenjammer under the test established in *Bell v. Wolfish*, 441 U.S. 520, 529 (1979). (*See* R&R at 28.) Under the *Bell* framework, the court considers: (1) the scope of the intrusion; (2) the manner in which the search was conducted; (3) the justification for initiating the search; and (4) the place in which the search was conducted. *See Bell*, 441 U.S. at 559; *see also Byrd v. Maricopa Cty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011) (applying the *Bell* framework).

The Ninth Circuit has long recognized that "[t]he desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is

impelled by elementary self-respect and personal dignity." *York v. Story*, 324 F.2d 450,

455 (9th Cir. 1963). Further, although the Ninth Circuit has not articulated a clear

standard for when a police officer may view an individual's naked body, other circuits

have recognized that a search involving "movement of clothing to facilitate the visual

inspection of a [person's] naked body . . . qualifies as a type of sexually invasive search."

*Sims v. Labowitz*, 885 F.3d 254, 260-61 (4th Cir. 2018) (internal quotations and citation

omitted). These sexually invasive searches constitute "an extreme intrusion upon

personal privacy, as well as an offense to the dignity of the individual." *Id.* (quoting

*Wood v. Clemons*, 89 F.3d 922, 929 (1st Cir. 1996)). Moreover, as both parties admit,

courts have not articulated the circumstances under which a search of the exposed body

of a private person—as opposed to the body of a prisoner or detainee—is reasonable.

Suffice it to say, the privacy interests of a private person in a hospital bed are not

diminished in the way they are for convicted prisoners and pretrial detainees, in part

because there are no "considerations of internal security within [a] corrections facilit[y]."

*See, e.g.*, *Bell*, 441 U.S. at 545-48.

Under the reasons articulated in cases involving prisoners and detainees, the court

concludes that Defendants are not entitled to qualified immunity on Plaintiffs' Fourth

Amendment privacy claim. The Ninth Circuit has emphasized that strip-searching

arrestees must be weighed against the legitimate security concerns of the detention

facility. *See Bull v. City & Cty. of S.F.*, 595 F.3d 964, 981 (9th Cir. 2010) (collecting

cases). Therefore, a blanket policy of strip-searching arrestees that will not enter the

general prison population is unconstitutional because it is not "reasonably related to the

[detention facility's] interest in maintaining security." *Way v. Cty. of Ventura*, 445 F.3d 1157, 1161 (citation omitted); *see Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1446 (9th Cir. 1991) (same). Rather, these searches must be justified under different principles, such as incident to an arrest, *see United States v. Robinson*, 414 U.S. 218, 235 (1973), or exigent circumstances, *see Schmerber*, 384 U.S. at 771-72; *see also Bull*, 595 F.3d at 981.

Defendants take issue with report and recommendation relying on cases that involve inmates, arrestees, and parolees, arguing that these cases arise in a different context and are therefore not applicable to Ms. Katzenjammer. (*See* Obj. at 4-5.) If anything, reliance on these different contexts favors Defendants—as explained, the cases involve populations with lesser privacy expectations than Ms. Katzenjammer. Consequently, considering that the Ninth Circuit has determined that a blanket strip-search policy is unconstitutional unless the person will enter the general prison population or a separate principle justifies the search, it is all-the-more clearly established that such a search is unconstitutional when conducted on a person with undiminished privacy rights, such as Ms. Katzenjammer.

Defendants do not cite any special circumstance that allowed them to photograph unclothed and sensitive parts of Ms. Katzenjammer's body, nor does the court find any. (*See* Obj.) To the extent Defendants were conducting an investigation, Defendants did not have a "legitimate" concern that the taser marks on Ms. Katzenjammer would disappear before she awoke and they could ask her consent. *Cf. Schmerber*, 384 U.S. at 771-72 (finding that officer could order a warrantless blood draw to determine

//

petitioner's blood-alcohol level, where waiting for a warrant threatened a "destruction of the evidence").

The court therefore DENIES Defendants' motion for summary judgment on Plaintiffs' Fourth Amendment privacy claim.

## C. *Monell* Claim

Defendants object to Magistrate Judge Peterson's recommendation to deny them summary judgment on Plaintiffs' *Monell* claim. (*See* Obj. at 5-6.) Magistrate Judge Peterson based this recommendation on a finding that, at the hearing, Defendants' counsel admitted that it was the Bellingham "police department's policy to document all injuries stemming from officers' use of force" and that, "[g]iven the early stage of this litigation . . . Plaintiffs should have an opportunity to conduct further discovery regarding" the policy. (R&R at 40-41.)

Under *Monell*, municipalities can be liable for deprivation of constitutional rights when the deprivation occurs pursuant to "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Monica*, 915 F.3d 592, 602-03 (9th Cir. 2019) (discussing *Monell*, 436 U.S. at 690-95). However, a municipality may not be sued under a theory of *respondeat superior. Monell*, 436 U.S. at 693-95. A plaintiff must show that a "*deliberate* action attributable to the municipality itself [is] . . . the moving force behind the plaintiff's deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty. Okla. v. Brown*, 520 U.S. 397, 400 (1997) (quoting *Monell*, 436 U.S. at 694) (internal quotations omitted). Thus, to prove a *Monell* claim, the plaintiff must (1)

identify a custom or policy that is attributable to the municipality and that caused his

injury; and (2) demonstrate that the custom or policy was adhered to with "deliberate

indifference" to his rights. *Castro v. Cty. of L.A.*, 833 F.3d 1060, 1076 (9th Cir. 2016.)

Defendants raise a number of issues with the report and recommendation. (*See*

Obj. at 5-6.) The court addresses three.

First, Defendants argue that Plaintiffs have not even pleaded *Monell* liability

arising out of the Defendants' taking pictures of Ms. Katzenjammer at the hospital. The

court agrees. Plaintiffs' claim regarding *Monell* liability centers exclusively on racial

profiling. (*See* Compl. ¶¶ 5.6-5.13.) Plaintiffs' complaint makes no mention of the

photographs, such as it does with respect to their 42 U.S.C. § 1983 claim against the

individual officers. (*See id.* ¶ 5.2(i).) At most, Plaintiffs make a passing reference at the

Fourth Amendment in their *Monell* claim (alongside references to the "First, . . . Fifth,

Eighth, and Fourteenth Amendments to the U.S. Constitution, and rights under the

Washington State Constitution"), but that alone does not incorporate the photograph

allegations. (*Id.* ¶ 5.7.) Thus, although Defendants were denied summary judgment on

Plaintiffs' Fourth Amendment privacy violations, this does not provide a basis for

maintaining Plaintiffs' *Monell* claim.

Second, even if the *Monell* claim incorporated the disputed photographs, Plaintiffs

have not identified any facts from which a reasonable fact finder could reasonably find

that the police department had a policy or custom to take photographs in a manner that

violated Ms. Katzenjammer's privacy rights. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

324 (1986). Although Defendants' counsel represented at the hearing that it is the

department's policy "to document injuries after a use of force, and certainly in an application of a Taser," counsel also clarified, "I can't stand here and say it's protocol you have to go to the hospital" to document the injuries. (Tr. at 7:8:15.) Simply, Plaintiffs have not raised a genuine dispute of material fact that there is such a policy. (*See generally* Compl.; Resp.)

Finally, Magistrate Judge Peterson agreed that there is not currently evidence in the record that shows the police department has such a policy but denied summary judgment nevertheless because of "the early stage of this litigation." (R&R at 40.) This case, however, is not at an early stage. Plaintiffs filed their complaint in July 2018. (*See* Compl.) Discovery closes on September 16, 2019—in less than two months. (*See* Sched. Order. (Dkt. # 10) at 1.) Although Defendants filed their summary judgment motion on December 3, 2018 (*see* MSJ), which is well before the October 15, 2019, dispositive motions deadline (*see* Sched. Order at 1), Plaintiffs received four extensions and over four months to respond, *see supra* II. Although Plaintiffs complain that discovery had not yet commenced when Defendants filed their motion (*see* Resp. at 3), Plaintiffs make no representation that they have sought discovery in the year this case has been pending (*see id.*). Further, Plaintiffs have an avenue for relief if they do not have sufficient facts to respond to a summary judgment motion: Federal Rule of Civil Procedure 56(d) applies to this exact situation. Plaintiffs have not sought relief under this rule. (*See* Dkt.)

For the foregoing reasons, the court GRANTS Defendants' summary judgment on Plaintiffs' *Monell* claim.

//

**D.      Intentional Infliction of Emotional Distress/Outrage**

Defendants object to Magistrate Judge Peterson's recommendation to deny them summary judgment on Plaintiffs' claim for intentional infliction of emotional distress/outrage.  (Obj. at 7.)  Magistrate Judge Peterson recommended that whether Defendants' pictures of Ms. Katzenjammer satisfy this claim involves genuine disputes of material fact that are inappropriate for summary judgment.  (R&R at 43-44.)

The tort of outrage, also known as intentional infliction of emotional distress, "requires proof of three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress."  *Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003).  "Any claim of outrage must be predicated on behavior so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Strong v. Terrell*, 195 P.3d 977, 982 (Wash. Ct. App. 2008) (internal quotation marks and citations omitted).

"The elements of outrage generally are factual questions for the jury." *Sutton v. Tacoma Sch. Dist. No. 10*, 324 P.3d 763, 768 (Wash. Ct. App. 2014).  "However, a trial court faced with a summary judgment motion must make an initial determination as to whether the conduct may reasonably be regarded as so 'extreme and outrageous' as to warrant a factual determination by the jury."  *Id.* (internal quotation marks and citations omitted).  A court may consider several factors, including:

> (1) the position the defendant occupied, (2) whether the plaintiff was particularly susceptible to emotional distress and the defendant was aware of the susceptibility, (3) whether the defendant's conduct was privileged, (4)

whether the degree of emotional distress was severe as opposed to merely annoying, inconvenient or embarrassing, and (5) whether the defendant was aware of a high probability that his or her conduct would cause severe emotional distress, and consciously disregarded that probability.

*Id.* at 768-69.

Defendants argue that the report and recommendation errs because, similar to their arguments above, it relies on facts that are not in the record, *see supra* § III.B, and the facts that are properly in the record do not support an outrage claim (*see* Obj. at 7).

As the court discussed above, Defendants' argument regarding the facts in the record is without merit. *See supra* § II.B. The report and recommendation appropriately viewed the evidence in the light most favorable to Plaintiffs. In this light, and based on the record, the court concludes that Defendants' conduct in photographing Ms. Katzenjammer "may reasonably be regarded as so 'extreme and outrageous' as to warrant a factual determination by the jury." *Sutton*, 324 P.3d 768. The court therefore DENIES Defendants' motion for summary judgment on this claim.

## IV.    CONCLUSION

For the foregoing reasons, the court ORDERS as follows:

(1) The court ADOPTS in part and REJECTS in part the R&R (Dkt. # 50);

(2) The court GRANTS in part and DENIES in part Defendants' motion for

summary judgment (Dkt. # 11);

//

//

//

(3) The court DIRECTS the Clerk to send copies of this order to the parties and to

Magistrate Judge Peterson.

Dated this 6th day of August, 2019.

JAMES L. ROBART
United States District Judge