UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DANIEL AND RICHARD YOUNG, *et al.*,

                              Plaintiffs,

        v.

PATRICK PENA, *et al.*,

                              Defendants.

Case No. 2:18-cv-1007-JLR-MLP

AMENDED REPORT AND
RECOMMENDATION

## I.       INTRODUCTION AND SUMMARY CONCLUSION

This matter comes before the Court on the unopposed second motion for summary judgment brought by the only two remaining defendants in this action, Bellingham Police Department Officers Travis Hauri and Sergeant David Johnson (collectively, "Defendants"). (Dkt. # 61 (Defendants' Second Motion for Summary Judgment ("Mot. Summ. J.")).) The Court previously granted Defendants' prior motion for summary judgment and dismissed all of Plaintiffs Richard Young and Katherine Wren Katzenjammer's claims,[1] with the exception of

---

[1] As discussed in the Court's prior Report & Recommendation ("R&R"), since the time of the events at issue, Daniel Young became known as Katherine Wren Katzenjammer. The Court refers to Ms. Katzenjammer by her chosen name unless it is necessary to accurately quote statements from the record. As all the claims in this case relating to Richard Young have been dismissed, the Court's discussion in this R&R relate to Ms. Katzenjammer ("Plaintiff").

1   Ms. Katzenjammer's Fourth Amendment privacy claim and a related claim for intentional

2   infliction of emotional distress. (Dkt. # 53 (Judge Robart's 8/6/19 Order Adopting In Part and

3   Rejecting in Part Report & Recommendation).) These two remaining claims relate solely to

4   photographs taken of Plaintiff's injuries at the hospital after the use of force incident between

5   Defendants and Plaintiff on the evening of June 2, 2016, and Plaintiff's allegation of emotional

6   harm stemming from the taking of the photographs without her knowledge or consent.

7         Defendants filed a second motion for summary judgment on October 9, 2019, once again

8   asking the Court to dismiss Plaintiff's Fourth Amendment privacy and outrage claims because

9   the record now contains photographs showing that Ms. Katzenjammer was not fully naked when

10  she was photographed, but was wearing underwear, contrary to Plaintiff's earlier representation

11  in her declaration. (Mot. Summ. J.)[2] Although Plaintiff failed to file a brief in opposition to

12  Defendants' motion, counsel for both parties participated in oral argument on November 25,

13  2019. (Dkt. # 75.) For the reasons set forth below, the Court recommends that Defendants'

14  second motion for summary judgment (dkt. # 61) be DENIED, and this case proceed to trial.

15                          **II.      BACKGROUND**

16        The remaining claims in this action, following the Court's prior grant of partial summary

17  judgment to Defendants, relate solely to the actions of Officer Travis Hauri and his superior, Sgt.

18  David Johnson, at the hospital on the evening of June 2, 2016. As Plaintiff has not filed any

19  additional declarations or other evidence opposing the instant motion for summary judgment,

20  and was unconscious during the events at the hospital, the evidence in the record primarily

21  consists of Officer Hauri and Sgt. Johnson's first and second declarations and supporting

22

23  _____
    [2] Plaintiff asserted in her declaration that "[w]hile I was in the hospital and unconscious[], the Bellingham
    Police Department came and manipulated my naked body in order to take pictures." (Dkt. # 36 (4/23/2019
    Declaration of Katherine Wren Katzenjammer ("Katzenjammer Decl.")) at ¶ 106.)

AMENDED REPORT AND RECOMMENDATION
- 2

1   exhibits, including portions of Ms. Katzenjammer's deposition transcript and the photographs

2   Officer Hauri took of an unconscious Ms. Katzenjammer in the hospital.[3] The Court also relies

3   on Plaintiff's declaration submitted in opposition to Defendants' first motion for summary

4   judgment, and construes the facts in Plaintiff's favor as the non-moving party. To the extent

5   either party's version of events is contradicted by the photographs, however, the Court must

6   accept the facts as depicted in the photographic evidence.[4]

7           On June 2, 2016, Ms. Katzenjammer was involved in an incident with Bellingham Police

8   Officers and others at her father's apartment on Maplewood Avenue. (Dkt. # 12 (11/9/2018

9   Nicolas Sturlaugson Declaration ("Sturlaugson Decl.")) at ¶¶ 3-5; Dkt. # 13 (11/18/2018 Patrick

10  Peña Declaration ("Peña Decl.")) at ¶¶ 3-5.) She was tased twice by officers after she failed to

11  comply with their directives. (Sturlaugson Decl. at ¶¶ 9-11; Peña Decl. at ¶¶ 8-11.) Although Ms.

12  Katzenjammer's father, Richard Young, was arrested for assaulting an officer and booked into

13  the Whatcom County Jail, Plaintiff was never arrested or booked into jail. (Sturlaugson Decl. at ¶

14  17; Peña Decl. at ¶ 19.) The specific facts surrounding Defendants' use of force against Plaintiff

15  are well-documented in the record, and need not be repeated here.

16

17  [3] (Dkt. # 17 (11/15/2018 Travis Hauri Declaration ("First Hauri Decl.")); Dkt. # 18 (11/7/2018 David
    Johnson Declaration ("First Johnson Decl.")); Dkt. # 65 (10//2019 Travis Hauri Declaration ("Second
18  Hauri Decl.")), Ex. A (photographs of Ms. Katzenjammer); Dkt. # 64 (9/30/2019 David Johnson
    Declaration ("Second Johnson Decl.")); Dkt. # 62 (10/19/2019 Declaration of Shane Brady ("Brady
19  Decl.")), Ex. A (Deposition of Katherine Katzenjammer ("Katzenjammer Dep.").)

    [4] Typically, on summary judgment, courts are required to view the facts and draw reasonable inferences
20  "in the light most favorable to the party opposing the [summary judgment] motion." *United States v.
    Diebold, Inc*., 369 U.S. 654, 655 (1962) (per curiam). The United States Supreme Court has
21  acknowledged that "[i]n qualified immunity cases, this usually means adopting . . . the plaintiff's version
    of the facts." *Scott v. Harris*, 550 U.S. 373, 376 (2007). However, "[w]hen opposing parties tell two
22  different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could
    believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for
23  summary judgment." *Id*. at 380. The Court finds that the same principle holds true for contemporaneously
    taken photographs, and declines to adopt either party's version of the facts to the extent it is contradicted
    by the photographic evidence in the record.

AMENDED REPORT AND RECOMMENDATION
- 3

1    After Ms. Katzenjammer was tased, Sgt. Johnson called medics to the scene because he

2    believed Ms. Katzenjammer was experiencing excited delirium. (First Hauri Decl. at ¶¶ 9-10;

3    Second Johnson Decl. at ¶ 5.) Plaintiff was sedated by the medics and taken to St. Joseph's

4    Hospital for treatment. (First Hauri Decl. at ¶ 11.)[5]

5    After their investigative duties on Maplewood Avenue were completed, Sgt. Johnson and

6    Officer Hauri went to the Emergency Department at St. Joseph Hospital to speak with Ms.

7    Katzenjammer about the incident. (First Johnson Decl. at ¶ 11.) Officer Hauri asserts that his

8    purpose in going to the hospital was to "possibly discuss the incident if he was willing and to

9    document via photograph any physical injuries he suffered from the incident." (Second Hauri

10   Decl. at ¶ 7.) Sgt. Johnson similarly asserts that his purpose in going to the hospital was to

11   complete the use of force investigation, which would have included speaking with Ms.

12   Katzenjammer about the incident and documenting via photography any physical injuries she

13   suffered from the incident. (Second Johnson Decl. at ¶ 7.)

14   Throughout Sgt. Johnson and Officer Hauri's interactions with Ms. Katzenjammer, Ms.

15   Katzenjammer appeared to them to be male and had not yet begun the physical process of

16   affirming her identity as a female. (Second Johnson Decl. at ¶ 4; Second Hauri Decl. at ¶ 4;

17   Katzenjammer Dep. at 43:1-25.) Neither officer was advised that she identified as a woman, or

18   observed evidence of that nature. (*Id.*) When Sgt. Johnson spoke with Ms. Katzenjammer's

19   father, Richard Young, outside the apartment building following his arrest, he referred to Ms.

20   Katzenjammer as "he," "him," and his "son." (Second Johnson Decl. at ¶ 4.)

21   When Sgt. Johnson and Officer Hauri arrived at the hospital, they were allowed by

22   hospital staff to enter the room where Ms. Katzenjammer was located. (*Id.* at ¶ 9; Second Hauri

23

---

[5] Officer Hauri and Sgt. Johnson were not involved with the medics' decision to sedate or transport
Plaintiff to the hospital. (Second Hauri Decl. at ¶ 5; Second Johnson Decl. at ¶ 5.)

AMENDED REPORT AND RECOMMENDATION
- 4

Decl. at ¶ 9.) Both officers assert in their declarations that in their experience as police officers in Bellingham and elsewhere, "it is common for officers to contact suspects and others who were involved in a criminal incident or an accident in the emergency room. Further, as was the case here, hospital staff has always allowed officers to contact subjects in the emergency room and elsewhere in the hospital when it is medically safe to do so." (Second Johnson Decl. at ¶ 10; Second Hauri Decl. at ¶ 10.)

In Ms. Katzenjammer's hospital room, Sgt. Johnson and Officer Hauri found Ms. Katzenjammer unconscious in bed, wearing a hospital gown and underwear. (Second Johnson Decl. at ¶ 11; Second Hauri Decl. at ¶ 11.) Ms. Katzenjammer's genitalia were not exposed. (*Id.*; Katzenjammer Dep. at 41:5-12.) Sgt. Johnson and Officer Hauri assert that they did not see Ms. Katzenjammer's genitalia at any point during the contact, nor did they photograph her genitalia or bare buttocks. (Second Johnson Decl. at ¶ 11; Second Hauri Decl. at ¶ 11.) The officers' statements are contrary to Ms. Katzenjammer's assertion in her declaration, filed in opposition to Defendants' first motion for summary judgment, that "[w]hile I was in the hospital and unconscious[], the Bellingham Police Department came and manipulated my naked body in order to take pictures." (Katzenjammer Decl. at ¶ 106.) However, Sgt. Johnson and Officer Hauri's descriptions of Ms. Katzenjammer's state of dress in her hospital bed are consistent with the photographs of Ms. Katzenjammer taken by Officer Hauri, which show that her entire torso (including her chest and upper back), underwear-clad groin, and right thigh were exposed at some point during their visit. (Second Hauri Decl., Ex. A; Second Johnson Decl. at ¶ 13; Second Hauri Decl. at ¶ 13.)[6]

---

[6] As discussed in the Court's Order dated October 9, 2019, neither the photographs (nor a detailed description of the contents of the photographs) were submitted by either party in relation to Defendants' first motion for summary judgment. (Dkt. # 69.)

AMENDED REPORT AND RECOMMENDATION
- 5

1    Specifically, in the pictures of Ms. Katzenjammer's bare chest, stomach, underwear-clad

2    groin, and thigh, which include close-up shots of her injuries from the taser probes, she is laying

3    on her left side with her hospital gown lifted up to right above her nipples, but still covering her

4    shoulders. (*Id*. at 3-5.) The hospital bedsheets have apparently also been pulled down to her

5    knees to reveal her thighs. Similarly, in the pictures documenting her taser probe injury to her

6    right thigh, she appears to be in substantially the same position with the bedsheets pulled down

7    to her knees. (*Id*. at 6-8.) In the two final photographs documenting a bruise on the back of her

8    right shoulder, Ms. Katzenjammer's hospital gown has been pulled down by someone, leaving

9    her upper back and entire right shoulder bare. (*Id*. at 9-10.) In the final photograph, a gloved

10   hand is visible, holding up a placard with a ruler attached next to Plaintiff's shoulder, apparently

11   to measure the size of Ms. Katzenjammer's bruise. (*Id*. at 10.) The placard indicates that the

12   photograph was taken by Officer Hauri. (*Id*.)

13   Both officers assert that, to the best of their recollection, they had a brief conversation

14   with a nurse about the location of Ms. Katzenjammer's injuries. (Second Johnson Decl. at ¶ 12;

15   Second Hauri Decl. at ¶ 12.) Officer Hauri "then photographed the locations on Mr. Young's

16   body that the hospital staff identified." (*Id*.) Officer Hauri also photographed a bruise on Ms.

17   Katzenjammer's shoulder that Officer Hauri believed to have been caused by the force used to

18   pin her to the ground when she was resisting arrest. (Second Hauri Decl. at ¶ 12.) The officers

19   assert that they "did not physically examine Mr. Young's body." (Second Johnson Decl. at ¶ 17;

20   Second Hauri Decl. at ¶ 17.) Officer Hauri asserts that he "only looked at and photographed the

21   areas that were believed to be the taser probe marks and a bruise on his shoulder." (Second Hauri

22   Decl. at ¶ 17.) Sgt. Johnson's Longarm Case Report regarding the hospital visit similarly

23   provides as follows:

Investigator Hauri and I went to the Emergency Department at St Joseph Hospital and located DANIEL YOUNG (C1) who was unconscious in one of the rooms.
A nurse advised that the taser probes had already been removed from DANIEL YOUNG (C1), but she had noted that three taser probes that contacted his abdomen and one had contacted his thigh. Investigator Hauri photographed the possible locations where the probes had contacted DANIEL YOUNG (C1). DANIEL YOUNG (C1) was unconscious during this entire process and we were unable to ask him any questions.

(Dkt. # 18, Ex. A at 3.)

Sgt. Johnson and Officer Hauri each assert that "[t]o the best of my memory and after looking at the photographs, which show Mr. Young laying in the same position in each photograph, I can say that I did not move or touch Mr. Young's body at any point." (Second Johnson Decl. at ¶ 14; Second Hauri Decl. at ¶ 14.)

Although the pictures clearly show that Ms. Katzenjammer's hospital gown (and likely bedsheets) were manipulated to reveal her bare torso, shoulder, and thigh, both officers assert that they do not recall moving or manipulating the hospital gown that Ms. Katzenjammer was wearing. (Second Johnson Decl. at ¶ 16; Second Hauri Decl. at ¶ 16.) Both officers assert that if Ms. Katzenjammer's gown "was moved or manipulated in some way, that would have been done by or with the supervision of the hospital staff on scene." (*Id*.)

After taking the photographs, Sgt. Johnson and Officer Hauri left the hospital. (*Id*. at ¶ 18.) Both officers assert that their usual practice is to not touch or move a hospitalized subject, or their clothing, and "if a hospitalized subject's body or clothing is manipulated while law enforcement is present, it would be done by hospital staff or under the supervision and assistance of hospital staff." (*Id*. at ¶ 15.)[7]

---

[7] Both officers further assert that they would not "order a hospital staff person to do anything to a patient." (*Id*.)

AMENDED REPORT AND RECOMMENDATION
- 7

Sgt. Johnson asserts that "as a best practice, the officers at the Bellingham Police Department try to document injuries after a use of force incident. The purpose of the photographs in this case was to document any injuries from the use of force, not to gather more evidence to support the criminal charges." (Second Johnson Decl. at ¶ 7.) Sgt. Johnson asserts that it is "best practice to have a complete investigation, which includes documenting potential injuries and injuries after a use of force incident" to provide "the involved subject, the City, the Police Chief, and the public [with] accurate information about the incident and any injuries." (*Id*. at ¶ 8.) He further asserts that "it would be in the best interest of all parties to document the injury, regardless of whether those photographs support a claim of unlawful force or not, so that all parties and the public had accurate information." (*Id*.)

Similarly, Defendants submitted a declaration from a police sergeant with the City of Bellevue Police Department, Joseph Engman, who is unconnected with this incident but has substantial experience training new officers with regard to use of force. (Dkt. # 63 (10/1/19 Declaration of Joseph Engman ("Engman Decl.")).) Officer Engman opined that "a complete and comprehensive Use of Force investigation where all the evidence is gathered and preserved combined with a transparent review process is essential . . . [and] [i]t is extremely important that this evidence be collected as soon as possible in order to clearly and accurately represent what occurred during the force incident." (Engman Decl. at ¶ 28.) He indicated that it is "a common occurrence and standard practice for officers to continue investigations at medical facilities in order to contact and follow up with arrested or detained subjects who are receiving additional medical treatment for a variety of reasons." (*Id*. at ¶ 29.) Mr. Engman opined, "in this case there was still probable cause to arrest Mr. Young and if he were to be medically cleared he could be booked into jail on the previously established criminal charges." (*Id*.) Finally, Mr. Engman

indicated that in most situations it is standard procedure to photograph injuries to suspects caused by police personnel, although "[i]n most situations this would be with the voluntary consent of the subject who was injured." (*Id*. at ¶ 31.)

During her deposition, Ms. Katzenjammer testified that she had been advised by her counsel that pictures of her had been taken by Defendants while she was unconscious, but she did not see the pictures until the day of her deposition on September 25, 2019, three years after the incident. (Katzenjammer Dep. at 35:10-36:24.)

## III.    PROCEDURAL BACKGROUND

As noted above, the only remaining claims in this case following the Court's ruling on Defendants' first motion for summary judgment are Ms. Katzenjammer's claims that Sgt. Johnson and Officer Hauri's conduct in photographing her unconscious body at the hospital violated her Fourth Amendment rights, as well as her related state law claim for intentional infliction of emotional distress stemming from this alleged invasion of her bodily privacy. (Dkt. # 53 (Judge Robart's Order).)

On October 9, 2019, shortly before the dispositive motion deadline, Defendants filed the instant second motion for summary judgment which included, for the first time, the photographs taken of Ms. Katzenjammer by Officer Hauri at the hospital and further details about Sgt. Johnson and Officer Hauri's actions at the hospital. (Mot. Summ. J.) Following a telephonic status conference with counsel for both parties, the Court granted Plaintiff an extension of time to file any opposition. (Dkt. # 72.) Although Plaintiff failed to file a brief in opposition to Defendants' summary judgment motion, she opposed the motion during oral argument on November 25, 2019. (Dkt. # 75.)

# IV.    DISCUSSION

## A.    Summary Judgment Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

However, the court need not, and will not, "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). Uncorroborated allegations and "self-serving testimony" will not create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *T.W. Elec. Serv. v. Pac Elec. Contractors Ass'n*, 809 F. 2d 626, 630 (9th Cir. 1987).

### B.      Legal Standards Governing Qualified Immunity

Police officers "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether a police officer is entitled to qualified immunity, the court must decide: (1) whether the facts that the plaintiff alleges assert a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time the defendant engaged in the misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (discussing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). To determine whether a right was clearly established, "the standard is one of fair warning: where the contours of the right have been defined with sufficient specificity that a state official had fair warning that [his] conduct deprived a victim of his rights, [he] is not entitled to qualified immunity." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003) (quotation marks and citation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

Where a "genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial." *Bonivert v. Clarkson*, 883 F.3d 865, 871-72 (9th Cir. 2017). Courts may consider the two prongs of the qualified immunity analysis in any order. *See Chism v. Washington*, 661 F.3d 380, 386 (9th Cir. 2011). The Court will first consider whether Ms. Katzenjammer's alleged right to bodily privacy under the Fourth Amendment was clearly established at the time the photographs were taken in 2016.

### C.   Ms. Katzenjammer's Right to be Free from a Strip Search of her Underwear-Clad Body Was Clearly Established in 2016

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767 (1966). "[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Id.* at 768. "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *United States v. Knights*, 534 U.S. 112, 118-19 (2001) (quoting *Wyoming v. Houghton,* 526 U.S. 295, 300 (1999)); *see also Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

It is well-settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Custamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1973)); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 454-455 (1971); *Chambers v. Maroney*, 399 U.S. 42, 51 (1970). It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause, is a search that is conducted pursuant to consent. *Schneckloth*, 412 U.S. at 219 (citing *Davis v. United States*, 328 U.S. 582, 593-94 (1946).) The U.S. Supreme Court has repeatedly acknowledged that "the Fourth Amendment protects people, not places," and "what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz*, 389 U.S. at 352.

Similarly, the Ninth Circuit has long recognized that "[t]he desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963). Federal courts further acknowledge that "movement of clothing to facilitate the visual inspection of a [person's] naked body . . . qualifies as a type of sexually invasive search." *Sims v. Labowitz*, 885 F.3d 254, 260-61 (4th Cir. 2018) (internal quotations and citation omitted). For example, in *Edgerly v. City and Cnty. of San Francisco*, the Ninth Circuit reiterated that "a mere visual inspection of an arrestee's naked body constitutes a strip search." 599 F.3d 946, 957–58 (9th Cir. 2010) (citing *Giles v. Ackerman*, 746 F.2d 614, 617 (9th Cir. 1984)), *overruled in part by Bull v. City and County of San Francisco,* 595 F.3d 964, 977 (9th Cir. 2010) (en banc) ("We have consistently required consideration of individual factors, such as arrest charges, criminal history, and suspicious behavior, to justify strip searches of pre-arraignment arrestees.").

As discussed in greater detail below, the crux of Defendants' second motion for summary judgment is that there is no clearly established right to be free from a search involving the manipulation of clothing to enable visual inspection of an undergarment, unlike the right to be free from such a search exposing genitalia and similar private parts, and therefore Defendants are entitled to qualified immunity. (Mot. Summ. J. at 7-13.) During oral argument, Plaintiff responded that the federal authority upon which Defendants rely is inapposite because Defendants are attempting to compare the search of Ms. Katzenjammer conducted by Sgt. Johnson and Officer Hauri with federal caselaw grappling with whether a particular search of a subject in the custodial, prison, or similar context (where the subject of the search has diminished privacy interests) constitutes a "strip search." Plaintiff argued that U.S. Supreme Court precedent has long established that any search is "per se unreasonable" absent either a warrant, probable

1   cause, or consent, and none of these exceptions were established in this case. Thus, the Court

2   should focus its analysis on the constitutionality of Defendants' conduct under the United States

3   Supreme Court's decision in *Bell v. Wolfish*. Finally, Plaintiff argued that Ms. Katzenjammer

4   was not in police custody at the time the photographs were taken, and was eventually charged

5   with misdemeanors that would not justify such an invasive search even if she had been in

6   custody. (Dkt. # 34 at 24.)

7           A review of the authority relied upon by Defendants supports Plaintiff's position. As a

8   threshold matter, Defendants contend that Ninth Circuit caselaw establishes that criminal

9   suspects do not have a right to privacy in a hospital room. (Mot. Summ. J. at 8 (citing *United*

10  *States v. George*, 987 F.2d 1428, 1432 (9th Cir. 1993)).) However, the case upon which

11  Defendants rely is inapplicable here, as Ms. Katzenjammer was not under arrest at the time of the

12  search. In *United States v. George*, the Ninth Circuit held that the defendant did not have a

13  reasonable expectation of privacy in his hospital room, expressly distinguishing that case from

14  "the state law cases cited by [defendant which] all involved circumstances in which the police

15  seized evidence before the defendant was placed under arrest." 987 F.2d at 1432. The Ninth

16  Circuit pointed out that the defendant "did not voluntarily admit himself to the hospital; he was

17  admitted under police supervision following his arrest. . . . [u]nder these circumstances, it would

18  be wholly unrealistic not to expect the police to place [the defendant] under surveillance." *Id.*

19  Defendants have not cited any authority, and the Court is aware of none, establishing that

20  Plaintiff – as a private citizen who has not been placed under arrest – does not have a reasonable

21  expectation of bodily privacy while he was receiving medical treatment in a hospital room. Thus,

22  Defendants' assertion that the Court should not presume that Plaintiff is entitled to more privacy

23

AMENDED REPORT AND RECOMMENDATION
- 14

than a prisoner simply by virtue of the fact that she was in the hospital is unpersuasive. (Mot. Summ. J. at 13.)

In support of Defendants' argument that "caselaw draws a clear distinction between searches where law enforcement views a naked body or genitalia, and much less invasive searches that involve viewing undergarments," Defendants cite to numerous federal cases where, indeed, federal courts found that a particular strip search that exposed the subject's genitalia, buttocks, or breasts in a public setting violated the subjects' rights under the Fourth Amendment. (Mot. for Summ. J. at 8-11 (citing *Safford Unified School District No. 1 v. Redding,* 557 U.S. 364 (2009) (holding that a school official's order that a student "remove her clothes down to her underwear, and then 'pull out' her bra and the elastic band on her underpants . . . . in the presence of the two officials who were able to see her necessarily exposed breasts and pelvic area to some degree," constituted a search that could be fairly called a "strip search."); *Sims,* 885 F.3d at 261 (finding unreasonable strip search where minor was forced to expose genitals and masturbate in front of detectives so his erect penis could be photographed); *Edgerly,* 599 F.3d at 957 (holding that where subject was arrested and at the police station, an officer placed a finger within his boxer shorts and visually inspected his genitalia and buttocks, officers were not entitled to qualified immunity for the strip search); *Amaechi v. West,* 237 F.3d 356, 360 (4th Cir. 2001) (holding that an officer who searched an arrestee wearing a house dress without undergarments, where the officer brushed her naked genitalia, stuck his finger in her vagina, and touched her bare buttocks in front of her family and neighbors, was not entitled to qualified immunity); *United States v. Edwards,* 666 F.3d 877, 883 (4th Cir. 2011) (holding that officers' search involving pulling a suspect's pants and underwear six to seven inches away from his body to look inside his underwear with a flashlight to find drugs next to his penis was a strip search

because it exposed his genitalia)). All of these cases, however, involve subjects who had a diminished right to bodily privacy because they were either under arrest or there was reasonable suspicion to search them for contraband, unlike Plaintiff in this case.

By contrast, Defendants argue, federal courts have found that "searches that involve the exposure of an undergarment outside of the public view are reasonable and do not violate the Fourth Amendment." (Mot. Summ. J. at 10 (citing *United States v. Palmer*, 575 F.2d 721, 722-23 (9th Cir. 1978); *United States v. Dorlouis*, 107 F.3d 248 (4th Cir. 1997); *Scallion v. City of Hawthorne*, Case No. C05-6849-GAF, 2006 WL 8436208 (C.D. Cal. December 19, 2006)).) Specifically, in *United States v. Palmer*, a customs agent ordered a subject to lift her skirt, revealing her girdle, and the court held that it was not a strip search. 575 F.2d 721, 722-23 (9th Cir. 1978) ("[l]ifting of the skirts to reveal an undergarment is far less intrusive examination and requires less justification to render it reasonable," but lifting of a skirt to reveal an undergarment "tend[ed] toward the strip search in that if conducted in public it can be said to result in embarrassment to one of reasonable sensibilities"). However, *Palmer* involves a border search where the officers had "grounds for suspicion" that the subject was smuggling drugs in her undergarment. *Id.* at 722-23. Similarly, in *United States v. Dorlouis*, the Fourth Circuit held that requiring a subject to pull down his pants in the privacy of a police van, revealing his boxer shorts, was not a strip search. 107 F.3d 248, 256 (4th Cir. 1997). The Fourth Circuit emphasized that "the search did not occur on the street subject to public viewing but took place in the privacy of the police van." *Id. Dorlouis* involved a search incident to arrest based on probable cause. 107 F.3d at 256 ("Once the arrest was made, the officers were entitled, as incident to such arrest, to search the console of the Pathfinder and to search the person of Jacques Paul.").

1    The third and final case Defendants cite for this proposition, *Scallion v. City of*

2   *Hawthorne*, Case No. C05-6849-GAF, 2006 WL 8436208 (C.D. Cal. December 19, 2006), was

3   reversed by the Ninth Circuit due to concerns that the search at issue violated the Fourth

4   Amendment. The Ninth Circuit held that the "district court erred . . . by ruling that the booking

5   search of Scallion at the police station was reasonable and was not an illegal strip search in

6   violation of the Fourth Amendment. There remain genuine issues of material fact with respect to

7   the circumstances of the search and [the officer's] statement that she 'examined' Scallion's

8   breast area for contraband." *Scallion v. City of Hawthorne*, 280 Fed. Appx. 671, 673, 2008 WL

9   2230070 (9th Cir. May 29, 2008) (citing *Palmer,* 575 F.2d at 723; Cal. Penal Code § 4030(c)

10  (defining a "strip search" as "a search which requires a person to remove or arrange some or all

11  of his or her clothing so as to permit a visual inspection of the underclothing, breasts, buttocks,

12  or genitalia of such person.") Not only does *Scallion* fail to support Defendants' argument, but it

13  also involved a search of a subject following his arrest. Defendants' attempt to compare Plaintiff

14  to the subjects in these cases, inviting the Court to wade deep into the weeds with respect to what

15  should constitute an unconstitutional "strip search," does not withstand scrutiny.

16    As noted above, by filing a second motion for summary judgment, Defendants ask the

17  Court to find that Plaintiff's alleged privacy right to be free from the search at issue was not

18  "clearly established" at the time Defendants took the photographs of Plaintiff's unconscious

19  body. *See Pearson*, 555 U.S. at 232. To determine whether a right was clearly established, "the

20  standard is one of fair warning: where the contours of the right have been defined with sufficient

21  specificity that a state official had fair warning that [his] conduct deprived a victim of his rights,

22  [he] is not entitled to qualified immunity." *Serrano*, 345 F.3d at 1077 (quotation marks and

23

1    citation omitted); *Ashcroft*, 563 U.S. at 741 ("We do not require a case directly on point, but

2    existing precedent must have placed the statutory or constitutional question beyond debate.").

3         The Court finds that at the time Sgt. Johnson and Officer Hauri visually searched and

4    photographed Plaintiff's underwear-clad body in his hospital bed in 2016, Plaintiff's right to be

5    free from such an invasive search was clearly established. Even if Defendants did not manipulate

6    Ms. Katzenjammer's unconscious body in any way, it is clear from the photographs that either

7    Sgt. Johnson, Officer Hauri, or hospital staff at their request, lifted and lowered her hospital

8    gown to expose her bare, underwear-clad body for the officers to photograph her use of force

9    injuries. Importantly, it is undisputed that Defendants were not conducting this search based on

10   probable cause related to the misdemeanor charges ultimately filed (and dismissed) against Ms.

11   Katzenjammer. (Second Hauri Decl. at ¶ 7 ("My purpose in going to the hospital was to possibly

12   discuss the incident if he was willing and to document via photograph any physical injuries . . . .

13   My purpose in taking the pictures in this case was to document the injuries because there was a

14   use of force. I did not take the pictures to gather evidence in the criminal case against Mr.

15   Young."); Second Johnson Decl. at ¶ 7 (asserting that in light of the witnesses and body camera

16   video of the use of force incident, "it did not cross my mind that we needed more pictures to

17   support the criminal case. Rather, the only thought on my mind was documenting the injuries

18   because there was a use of force.").) It is also undisputed that they had no warrant to take the

19   pictures, and Ms. Katzenjammer was unconscious and unable to consent. (Second Hauri Decl. at

20   ¶ 11; Second Johnson Decl. at ¶ 11.)

21        Under these circumstances, the Court finds that U.S. Supreme Court precedent providing

22   that any search is unreasonable absent certain conditions, such as a warrant, probable cause, or

23   consent, provided Defendants with fair warning that their unauthorized search and photographing

AMENDED REPORT AND RECOMMENDATION
- 18

1  of Ms. Katzenjammer's body ran afoul of the Fourth Amendment. *See Schneckloth*, 412 U.S. at

2  219; *Katz*, 389 U.S. at 357; *Bell*, 441 U.S. at 559. Although it is certainly true that revealing a

3  subject's underwear in a private setting is not as sexually invasive as exposing their genitalia in a

4  public setting, caselaw drawing this distinction does not provide any basis for finding that Ms.

5  Katzenjammer's right to bodily privacy was diminished in this case as she was never arrested or

6  booked into jail. (First Hauri Decl. at ¶ 13.)[8]

7      D.    **Defendants' Search of Ms. Katzenjammer Was Unreasonable**

8          With this clearly established law concerning the right to bodily privacy as a backdrop, the

9  Court's next inquiry is whether Defendants' search was unreasonable under the test established

10  in *Bell v. Wolfish*, 441 U.S. at 559. Under the *Bell* framework, the court considers: (1) the scope

11  of the intrusion; (2) the manner in which the search was conducted; (3) the justification for

12  initiating the search; and (4) the place in which the search was conducted. *See Bell*, 441 U.S. at

13  559; *see also Byrd v. Maricopa Cty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011)

14  (applying the *Bell* framework).

15                      *1)    Scope of the Intrusion*

16          As discussed in detail above, Ms. Katzenjammer's gown was lifted and her hospital

17  bedsheets appear to have been pulled down to reveal her entire bare torso, including her chest,

18  stomach, and underwear, down to and including her right thigh. (Second Hauri Decl., Ex. A.)

19  Officer Hauri "then photographed the locations on Mr. Young's body that the hospital staff

20  identified," as well as a bruise on the back of Ms. Katzenjammer's right shoulder. (Second

21

22  ───────────────────
[8] Ms. Katzenjammer was later charged with several misdemeanors: assault in the fourth degree with

23  sexual motivation, obstructing law enforcement, and resisting arrest. (Dkt. # 14 (12/3/2018 Shane Brady
   Decl.), Ex. B.) However, the criminal charges against both Plaintiffs were eventually dismissed under
   deferred prosecution agreements with the respective prosecutors' offices. (*Id*., Ex. F.)

Johnson Decl. at ¶ 12; Second Hauri Decl. at ¶ 12.) Although the pictures appear to confirm that Ms. Katzenjammer's genitalia and bare buttocks were not exposed during the search, Ms. Katzenjammer is nevertheless entirely nude apart from a pair of underwear briefs.

Construing the evidence in the light most favorable to Plaintiff, either the officers, or hospital staff at their request, appear to have manipulated Ms. Katzenjammer's hospital gown by lifting it up to reveal her stomach and thigh injuries, and then pulling it down to reveal the bruise on her back. (Second Hauri Decl., Ex. A.) Plaintiff asserts that she was particularly traumatized by learning about the photographs, which were included in the police and criminal case records, because she was affirming her identity as a woman. (Dkt. # 34 at 24.) Regardless of whether Defendants were aware that Plaintiff was transgender at the time they took the photographs, which Sgt. Johnson and Officer Hauri maintain they were not, Ms. Katzenjammer was upset by the pictures of her bare chest because she personally considers her breasts to be a secondary sex organ. (Katzenjammer Dep. at 41:7-43:25.) Federal courts have long acknowledged that a sexually invasive search "constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual." *Sims*, 885 F.3d at 261.

The Court finds that the Defendants' search was highly intrusive, as Ms. Katzenjammer's right to bodily privacy had not been diminished. She was never placed under arrest, and she was not the subject of a search warrant. *Compare Edgerly*, 599 F.3d at 958 (noting that it was clearly established by 1989 that it is unlawful to strip search an *arrestee* brought to a jail facility on charges of committing a minor offense, unless the officer directing the search possesses a reasonable suspicion that the individual arrestee is carrying or concealing contraband). Accordingly, this factor weighs strongly in favor of Plaintiff.

1

2)      *Manner of the Search*

2          As noted above, when Sgt. Johnson and Officer Hauri arrived at the hospital, they were

3   allowed by hospital staff to enter the room where Ms. Katzenjammer was located. (Second

4   Johnson Decl. at ¶ 9; Second Hauri Decl. at ¶ 9.) In Ms. Katzenjammer's room, Sgt. Johnson and

5   Officer Hauri found Ms. Katzenjammer unconscious in bed, wearing a hospital gown and

6   underwear. (Second Johnson Decl. at ¶ 11; Second Hauri Decl. at ¶ 11, Ex. A.) Ms.

7   Katzenjammer's genitalia were not exposed. (*Id*.; Katzenjammer Dep. at 41:5-12.) Sgt. Johnson

8   and Officer Hauri assert that they did not see Ms. Katzenjammer's genitalia at any point during

9   the contact, nor did they photograph her genitalia or bare buttocks. (Second Johnson Decl. at ¶

10   11; Second Hauri Decl. at ¶ 11.)

11          To the best of their recollection, the officers had a brief conversation with a nurse about

12   the location of Ms. Katzenjammer's injuries. (Second Johnson Decl. at ¶ 12; Second Hauri Decl.

13   at ¶ 12.) Officer Hauri "then photographed the locations on Mr. Young's body that the hospital

14   staff identified." (*Id*.) Officer Hauri also photographed a bruise on Ms. Katzenjammer's shoulder

15   that Officer Hauri believed to have been caused by the force used to pin her to the ground when

16   she was resisting arrest. (Second Hauri Decl. at ¶ 12.) The officers assert that they "did not

17   physically examine Mr. Young's body." (Second Johnson Decl. at ¶ 17; Second Hauri Decl. at ¶

18   17.) Officer Hauri asserts that he "only looked at and photographed the areas that were believed

19   to be the taser probe marks and a bruise on his shoulder." (Second Hauri Decl. at ¶ 17.)

20          As noted above, the pictures reflect that the officers' inspection of Ms. Katzenjammer's

21   use of force injuries, even with the assistance of hospital staff, required lifting up her hospital

22   gown (and likely pulling down her bedsheets as well) to expose her body from above her nipples

23   to right above her knees. Even assuming that Ms. Katzenjammer's body was not manipulated in

AMENDED REPORT AND RECOMMENDATION
- 21

1   any way to access her upper back, Defendants (or hospital staff, in response to the officers'

2   request to be shown her injuries) appear to have also pulled down Ms. Katzenjammer hospital

3   gown, fully exposing her right shoulder, to examine her upper back for bruising. The officers

4   assert that if Ms. Katzenjammer's gown "was moved or manipulated in some way, that would

5   have been done by or with the supervision of the hospital staff on scene." (Second Johnson Decl.

6   at ¶ 16; Second Hauri Decl. at ¶ 16.)

7          Regardless of whether this search of Ms. Katzenjammer's body was conducted personally

8   by Defendants under supervision of the hospital staff, or by medical personnel at the officers'

9   request, this factor weighs in favor of finding Defendants' search unreasonable. Defendants'

10  assertion that "Plaintiff simply has no evidence to prove the officers conducted a search" because

11  "witnesses cannot say one way or another what happened" and "she was unconscious while at

12  the hospital and has no memory of the events," is also not persuasive. (Mot. Summ. J. at 14.)

13                    *3)*      *Justification for the Search*

14         As noted above, Officer Hauri and Sgt. Johnson justify their search on the grounds that

15  they were continuing their investigation relating to the officers' use of force at the apartment.

16  (First Hauri Decl. at ¶ 13; First Johnson Decl. at ¶ 11.)  Sgt. Johnson asserts that "as a best

17  practice, the officers at the Bellingham Police Department try to document injuries after a use of

18  force incident. The purpose of the photographs in this case was to document any injuries from

19  the use of force, not to gather more evidence to support the criminal charges." (Second Johnson

20  Decl. at ¶ 7.) Sgt. Johnson asserts that it is "best practice to have a complete investigation, which

21  includes documenting potential injuries and injuries after a use of force incident" to provide "the

22  involved subject, the City, the Police Chief, and the public [with] accurate information about the

23  incident and any injuries." (*Id.* at ¶ 8.) He further asserts that "it would be in the best interest of

1  all parties to document the injury, regardless of whether those photographs support a claim of

2  unlawful force or not, so that all parties and the public had accurate information." (*Id*.)

3          Documentation of any injuries stemming from police officers' use of force against a

4  suspect for evidentiary purposes is a legitimate government interest. However, this factor would

5  weigh more strongly in Defendants' favor if Ms. Katzenjammer had been under arrest at the time

6  of the search. There is no evidence that the officers could not have simply waited until she was

7  awake or returned at a later time to request her consent before photographing her. Even Officer

8  Engman, who provided a declaration in defense of Defendants' conduct in this case, conceded

9  that although it is standard procedure to photograph suspects' use of force injuries, "in most

10 situations this would be with the voluntary consent of the subject who was injured." (Engman

11 Decl. at ¶ 31.) The fact that Ms. Katzenjammer was a subject of Defendants' use of force

12 investigation and it is "standard policy" to photograph such injuries, without more, is not

13 sufficient to justify their failure to attain her consent. As noted above, Officer Hauri and Sgt.

14 Johnson were not searching for weapons, contraband, or any evidence of a crime. Accordingly,

15 this factor weighs only slightly in favor of Defendants.

16         *4)     Place Where the Search was Conducted*

17         Finally, the Court finds that the fact that the search was conducted in Ms.

18 Katzenjammer's private hospital room makes this intrusion more egregious, rather than less

19 egregious, as alleged by Defendants. Defendants contend that a suspect has no right to privacy in

20 his or her hospital room, citing caselaw holding that suspects who have been placed under arrest

21 do not have a reasonable expectation of privacy in their hospital room where the police have

22 entered the room to search for evidence of the crime at issue. (Mot. Summ. J. at 8 (citing *George*,

23 987 F.2d at 1432 (holding that a suspect who was involuntarily admitted to the hospital while

AMENDED REPORT AND RECOMMENDATION
- 23

suffering a drug overdose does not have a reasonable expectation of privacy in his hospital room)).) Of course, Ms. Katzenjammer was not under arrest, and it is undisputed that the officers were not searching for any contraband or evidence of a crime.

The Court finds that, in light of the fact that Ms. Katzenjammer was a private citizen who was not under arrest, she had a reasonable expectation of bodily privacy even though she was in a hospital room receiving medical care. The fact that a hospital room is a semi-private, rather than public, location does not mitigate the overall circumstances of the search. Although Defendants could reasonably enter the room to interview her and request her consent to photograph any injuries, it was not reasonable for the officers to presume that they could photograph her unconscious, nearly naked body absent her consent or a warrant based on probable cause. This factor also weighs in favor of finding the search unreasonable.

5)   *Weighing the Factors Under the* Bell *Framework*

The Court has balanced the invasion of personal rights caused by the search against the need for that particular search under the *Bell* framework, by weighing the scope, manner, justification, and place of the search. Defendants' interest in documenting evidence of any use of force injuries did not justify the scope or manner of the intrusion into Ms. Katzenjammer's most basic subject of privacy, her naked body. Accordingly, the Court finds that Defendants' actions were unreasonable, and likely violated Ms. Katzenjammer's Fourth Amendment rights. Moreover, a reasonable officer in Sgt. Johnson and Officer Hauri's position would have known that their intrusion into Ms. Katzenjammer's bodily privacy at the hospital was unreasonable, as she had not been arrested. *See Hope v. Pelzer,* 536 U.S. 730, 739-41 (2002) ("Officials can still be on notice that their conduct violates established law even in novel factual circumstances.").

1    Finally, Defendants ask the Court to apply several legal theories that are inapposite, at

2   best, and distasteful, at worst. For example, Defendants make much of the fact that Sgt. Johnson

3   and Officer Hauri do not recall whether they personally moved Ms. Katzenjammer's hospital

4   gown to expose her body, and want the Court to draw all reasonable inferences in their favor by

5   presuming that her injuries must have been in "plain view" of the officers when they entered the

6   hospital room. (Mot. Summ. J. at 20.) However, the Court must construe all facts in the light

7   most favorable to Plaintiff as the non-movant on summary judgment, and Defendants are not

8   entitled to the benefit of the doubt due to their own lapse in memory.

9    Similarly, Defendants' assertion that "there is no evidence the officers conducted a

10   search" because they cannot remember whether they lifted her hospital gown, Plaintiff was

11   unconscious, and there is no evidence that any other witnesses can recall who lifted Ms.

12   Katzenjammer's hospital gown, is, frankly, distasteful in light of the photographs taken by

13   Officer Hauri. (*Id.* at 14.) The Court also declines to assume that hospital staff personally

14   conducted the search and then "turned over" the private confidential information to law

15   enforcement, as these facts are not in the record before the Court. (*Id.* at 19 (citing *United States*

16   *v. Jacobsen*, 466 U.S. 109 (1984)).) The fact that a nurse told the officers where the location of

17   Ms. Katzenjammer's injuries were does not diminish Ms. Katzenjammer's privacy interest in her

18   own body, as she is not a package whose contents have been compromised. *See Jacobsen*, 466

19   U.S. at 1160. Defendants' clumsy attempt to analogize this case to such authority falls flat.

20    Accordingly, Sgt. Johnson and Officer Hauri are not entitled to qualified immunity on

21   Plaintiff's Fourth Amendment claim.

22

23

1

### E.    Plaintiff's Intentional Infliction of Emotional Distress (Outrage) Claim

2          The tort of outrage, also known as intentional infliction of emotional distress, "requires

3  proof of three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction

4  of emotional distress, and (3) actual result to plaintiff of severe emotional distress." *Kloepfel v.*

5  *Bokor,* 149 Wash.2d 192, 195, 66 P.3d 630 (2003). "Any claim of outrage must be predicated on

6  behavior so outrageous in character, and so extreme in degree, as to go beyond all possible

7  bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

8  community." *Strong v. Terrell*, 147 Wash.App. 376, 385, 195 P.3d 977 (2008) (internal

9  quotation marks and citations omitted).

10         "The elements of outrage generally are factual questions for the jury." *Sutton v. Tacoma*

11 *Sch. Dist. No. 10,* 180 Wash. App. 859, 869, 324 P.3d 763 (2014). "However, a trial court faced

12 with a summary judgment motion must make an initial determination as to whether the conduct

13 may reasonably be regarded as so 'extreme and outrageous' as to warrant a factual determination

14 by the jury." *Id.* (internal quotation marks and citations omitted). A court may consider several

15 factors, including: (1) the position the defendant occupied; (2) whether the plaintiff was

16 particularly susceptible to emotional distress and the defendant was aware of the susceptibility;

17 (3) whether the defendant's conduct was privileged; (4) whether the degree of emotional distress

18 was severe as opposed to merely annoying, inconvenient or embarrassing; and (5) whether the

19 defendant was aware of a high probability that his or her conduct would cause severe emotional

20 distress, and consciously disregarded that probability. *Id.* at 870. Whether conduct qualifies as

21 "extreme and outrageous" is a question for the fact-finder to determine. *Gravelet–Blondin v.*

22 *Shelton,* 728 F.3d 1086, 1100 (9th Cir. 2013).

23

Viewing the facts in the light most favorable to Plaintiff, the Court finds that Sgt. Johnson and Officer Hauri's conduct in photographing Ms. Katzenjammer in the hospital could potentially satisfy the requisite elements for this claim. Although Plaintiff testified at her deposition that the first time she had seen the photographs was on September 25, 2019, the morning of her deposition, she had been previously advised of their existence by her attorney. (Katzenjammer Dep. at 35:14-36:22.) She also became upset during her deposition and needed to request a break during questioning about the content of the photographs depicting her bare chest. (*Id*. at 36:25-39:8.)

As discussed in detail above, Defendants should have known that it was unlawful to search and photograph Ms. Katzenjammer while she was unconscious under the circumstances in this case. Regardless of whether the Defendants were aware that Ms. Katzenjammer, as a transgender individual affirming her identity as a woman, may have been particularly susceptible to emotional distress, Defendants should have aware of a high probability that such conduct would cause severe emotional distress to the subject of such an invasive search. Viewing the evidence in the light most favorable to Plaintiff, Defendants consciously disregarded that probability.

The Court therefore recommends that Defendants' motion for summary judgment on this claim be denied.

## V.   CONCLUSION

For the foregoing reasons, the Court finds that genuine issues of material fact preclude summary judgment on Plaintiff's remaining claims in this action, and the Court RECOMMENDS that Defendants' second motion for  summary judgment (dkt. # 61) be DENIED.

1       Objections to this Report and Recommendation, if any, should be filed with the Clerk and

2  served upon all parties to this suit by no later than **Wednesday, December 18, 2019**. Objections,

3  and any response, shall not exceed twelve pages. Failure to file objections within the specified

4  time may affect your right to appeal. Objections should be noted for consideration on the District

5  Judge's motion calendar **fourteen (14)** days after they are served and filed. Responses to

6  objections, if any, shall be filed no later than **fourteen (14)** days after service and filing of

7  objections. If no timely objections are filed, the matter will be ready for consideration by the

8  District Judge on **Thursday, December 19, 2019**.

9       The Clerk is directed to send copies of this Report and Recommendation to the parties

10  and to the Honorable James L. Robart.

11       Dated this 4th day of December, 2019.

12

13

14  _____
    MICHELLE L. PETERSON
15  United States Magistrate Judge

16

17

18

19

20

21

22

23